641 A.2d 248

MICHAEL ROIG, PLAINTIFF–RESPONDENT AND CROSS–
APPELLANT, v. DAVID T. KELSEY, DEFENDANT–
APPELLANT AND CROSS–RESPONDENT.

Argued January 3, 1994—Decided May 19, 1994.

*Vincent Jesuele* argued the cause for appellant and cross-
respondent (*Kessler, DiGiovanni and Jesuele,* attorneys).

*Anthony Bartell* argued the cause for respondent and cross-
appellant (*McCarter and English,* attorneys; *Andrew T. Berry,* of
counsel).

*Gerald H. Baker* argued the cause for *amicus curiae,* ATLA–NJ (*Baker, Garber, Duffy and Pedersen,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue is whether *N.J.S.A.* 39:6A–12 of the New Jersey Automobile Reparation Reform Act, *N.J.S.A.* 39:6A–1 to –35 (No–Fault Law), prohibits an injured party from recovering from a tortfeasor the medical-expense deductible and twenty-percent co-payment under a personal-injury-protection (PIP) policy. We conclude that the Legislature intended the No–Fault Law to bar that type of fault-based recovery.

## I

On January 15, 1990, David Kelsey was a passenger in an automobile driven by his sister when it was struck from behind by an automobile driven by Michael Roig. Kelsey was injured and incurred medical expenses of $1,769. Kelsey, who lived with his sister, was eligible for PIP medical-expense benefits under his sister's automobile-insurance policy, which contained the basic $250 medical-expense deductible and twenty-percent copayment for medical expenses between $250 and $5,000. Because of the deductible and copayment, $553.80 of Kelsey's medical expenses were unpaid. Kelsey had no other health-insurance policy that would have paid those medical expenses, and therefore he sought recovery from Roig.

Roig refused to pay and filed a declaratory-judgment action seeking relief from payment of Kelsey's outstanding medical expenses. He also moved for summary judgment on the ground that *N.J.S.A.* 39:6A–12 (section 12) prohibited recovery of the deductible and copayment. Kelsey cross-moved for summary judgment, asserting that section 12 allowed payment of expenses incurred up to the deductible amount. The trial court, concluding that the Legislature's intent to bar recovery of the medical deductible and copayment under section 12 was so clear that any

indication in the statute to the contrary must yield to it, granted Roig's motion.

The Appellate Division reversed the trial court and remanded the case for further proceedings. 262 *N.J.Super.* 579, 621 *A.*2d 540 (1993). That court held, however, that *only* if an injured party qualified to bring suit for non-economic losses under *N.J.S.A.* 39:6A–8 could that party include in that action against the tortfeasor the amount of the deductible and copayment not otherwise collectible from other insurance sources. *Id.* at 580–81, 621 *A.*2d at 540–41.

Kelsey sought certification, and Roig filed a cross-petition for certification. We granted both petitions, 133 *N.J.* 445, 446, 627 *A.*2d 1149, 1150 (1993).

## II

*No–Fault Law*

The original No–Fault Law enacted in 1972, *L.*1972, *c.* 70, was largely the work of the Automobile Insurance Study Commission, created in 1970 by a joint resolution of the Senate and General Assembly. *L.*1970, *J.Res.* 4. The adoption of that law was hailed as a major innovation in tort and insurance law that would end high automobile-insurance rates and congestion-causing numbers of personal-injury suits.

The No–Fault Law's goal was " 'compensating a larger class of citizens than the traditional tort-based system and doing so with greater efficiency and at a lower cost.' " *Oswin v. Shaw,* 129 *N.J.* 290, 295, 609 *A.*2d 415, 417 (1992) (quoting *Emmer v. Merin,* 233 *N.J.Super.* 568, 572, 559 *A.*2d 845, 846 (App.Div.), *certif. denied,* 118 *N.J.* 181, 570 *A.*2d 950 (1989)). That "new approach" to automobile insurance was to result

in the motoring public's securing protection at lesser cost, expediting the relief of the accident victim and his family from a frequently staggering and intolerable economic burden, and yet preserving that victim's right to full and adequate compensation in cases which *involve more serious and disabling injury.*

In addition to bringing about an intended reduction in insurance premiums, *another major benefit of the proposed system would be a reduction of the present court backlog.* A substantial percentage of civil court actions are automobile accident cases. Under the proposed plan, it is expected that *many of these cases would be settled outside the court, thereby permitting other more serious and meritorious causes to be heard with more dispatch.*

[*Governor's Second Annual Message* (January 11, 1972) (emphasis added).]

Although the movement to adopt no-fault legislation was the "result of ever-increasing automobile-insurance premiums," *Oswin, supra,* 129 *N.J.* at 295, 609 *A.*2d at 417, it also arose from the recognition that the necessity of determining fault in a lawsuit before recovery of medical expenses resulted in great hardship for many injured parties. See *Governor's First Annual Message* (January 12, 1971) (stating, "Too many injured persons must wait too long for an uncertain remedy while enduring physical and financial injury.") Thus, the proponents of the legislation anticipated that the elimination of minor personal-injury claims from the court system not only would reduce insurance premiums but also would provide prompt payment of medical expenses to injured parties.

To achieve those purposes the Legislature created the no-fault statutory scheme. Under that scheme every automobile liability-insurance policy issued in New Jersey had to provide PIP coverage, including medical-expense benefits, "without regard to negligence, liability or fault of any kind, to the named insured and members of his family residing in his household who sustained bodily injury as a result of an automobile accident." *N.J.S.A.* 39:6A–4. A person's no-fault insurance was to be an injured person's exclusive remedy for medical-expense claims arising out of an automobile accident. *See Smelkinson v. Ethel & Mac Corp.,* 178 *N.J.Super.* 465, 467, 429 *A.*2d 422, 423 (App.Div.1981) (holding that right of plaintiff to recover medical expenses directly from tortfeasor's insurer was to substitute the plaintiff's right to recover from insured tortfeasor).

As a trade-off for the payment of medical expenses, regardless of fault, no-fault systems provided for "either a limitation on or the elimination of conventional tort-based personal-injury lawsuits."

*Oswin, supra,* 129 *N.J.* at 295, 609 *A.*2d at 417. *N.J.S.A.* 39:6A–8 (section 8) provided such a limitation by holding that an injured person could file a lawsuit *only* if medical expenses exceeded a $200 threshold.

Section 12 also was part of the trade-off. In the original No–Fault Law, it read as follows:

> Evidence of the amounts collectible or paid pursuant to sections 4 and 10 of this act to an injured person is inadmissible in a civil action for recovery of damages for bodily injury by such injured person.

*N.J.S.A.* 39:6A–4 (section 4) and *N.J.S.A.* 39:6A–10 (section 10) were the provisions allowing for PIP coverage. Section 12 therefore disallowed recovery of PIP benefits "collectible" or "paid" in a civil suit.

In frequent attempts to lower the cost of insurance and eliminate minor personal-injury claims, the Legislature amended the No–Fault Law again in 1983, 1988, and 1990. *L.*1983, *c.* 362; *L.*1988, *c.* 119; *L.*1990, *c.* 8. In the 1983 amendments, the insured was presented with a number of options for coverage. The first choice was between a $200 or a $1,500 medical-expense threshold before a personal-injury suit could be instituted. The second choice was the selection of either a $500, $1,000, or $2,500 medical-expense deductible. *Ibid.;* Cynthia M. Craig & Daniel J. Pomeroy, *New Jersey Auto Insurance Law* § 5:2–1b, at 49 (1994) (hereinafter Craig & Pomeroy).

Included in the legislative history for the 1983 amendment, the New Jersey Automobile Freedom of Choice and Cost Containment Act of 1984, *N.J.S.A.* 39:6A–1 to –35, is a sponsor statement that explains the options available to motorists for no-fault medical benefits. It states:

> There would continue to be unlimited medical[-]expense benefits but insureds would have *the option to choose, at reduced premiums* stated as a percentage of the coverage premium, medical expense deductibles in amounts of $500, $1000 and $2500. *This option would permit an insured to coordinate his automobile[-]insurance coverage with other forms of health coverage.*
>
> [*Sponsor Statement to Assembly Bill No. 3981,* at 26 (1983) (emphasis added).]

The Legislature hoped that those optional deductibles would reduce the cost of automobile insurance by shifting some of the rising medical-expense costs to alternative forms of health insurance. *Ibid.*

Under the heading "Tort Limitation Option," that same Sponsor Statement posits that the statutory provision instituting monetary tort options of $200 or $1,500

> would require insurers to offer all insureds the right to choose to limit their right to sue for general damages *(pain and suffering)* resulting from bodily injuries incurred in an auto accident ... In return for electing the tort limitation option, *an insured would receive a reduction in his bodily injury liability premium stated as a percentage of the coverage premium.*
>
> [*Id.* at 27 (emphasis added).]

Once again, motorists were presented with another trade-off option: lower premiums in exchange for increased tort thresholds.

The Legislature also provided that no new automobile-insurance policy could be issued after July 1, 1984, unless the application contained a written notice of all available policy coverages and an identification of which coverages were mandatory and which were optional, as well as all deductible, exclusion, set-off and tort-limitation options offered by the insurer. *See N.J.S.A.* 39:6A–23. That provision was known as the "buyers guide." 262 *N.J.Super.* at 582–83, 621 *A.*2d at 541–42; Craig & Pomeroy, *supra*, at 50. Although the No–Fault Law did not require that insurance companies tell prospective policyholders required to choose a PIP deductible that they could recover their below-deductible expenses from a third party, it did require the companies to tell their policyholders that they should consider a high deductible if they "[were] already covered by a health insurance policy or a health maintenance organization" because "[i]n most cases, those plans [would] pay part of the medical bills which auto insurance [would] not pay." *N.J.A.C.* 11:3–15.6.

The only other source of legislative history concerning the 1983 amendment is found in the Sponsor's Statement under the heading "No–Fault and Related Clean–Up Provisions". It states, "These provisions mainly are designed to tighten statutory eligibility

requirements for personal injury protection coverage so as to comport with the original intent of the no-fault law." *Sponsor Statement to Assembly Bill No. 3981,* at 27 (1983). Accordingly, the 1983 amendment should be construed in a manner consistent with the original intent of the no-fault law, which was: to reduce the cost of insurance, to eliminate minor tort claims from the judicial system, and to have medical expenses paid promptly.

As originally enacted, section 12 did not deal with medical-expense-benefit deductibles and copayments because the No–Fault Law did not offer those options. The Legislature amended section 12 in 1983 to include those items:

> Evidence of the amounts collectible or paid ... to an injured person, *including the amounts of any deductibles or exclusions elected by the named insured pursuant to section 13 of this 1983 amendatory and supplementary act, otherwise compensated* is inadmissible in a civil action for recovery of damages for bodily injury by such injured person. (Emphasis added).

Deductibles were therefore specifically excluded from recovery. A final paragraph was also added:

> Nothing in this section shall be construed to limit the right of recovery, against the tortfeasor, of uncompensated economic loss sustained by the injured party.

That paragraph has remained intact through the current 1990 version of the statute. No legislative history specifically addresses the purpose or intent of that final paragraph of section 12.

Despite the 1983 amendments the cost of automobile insurance "continued to spiral, however, resulting in New Jersey's near lead position in the unenviable category of having the highest automobile insurance premiums in the country. This unenviable position led to consumer outrage and legislative efforts to enact legislation with significant premium reducing provisions." *Emmer, supra,* 233 *N.J.Super.* at 573, 559 *A.*2d at 847. Hence the Legislature in 1988 again amended the No–Fault Law by enacting "An Act concerning private passenger automobile insurance and revising parts of statutory law." *Id.* at 574, 559 *A.*2d at 848. That Act contained a series of amendments to the No–Fault Law.

In the 1988 amendments, "the Legislature gave to the consumer the choice of a limited right to sue and a lower premium, or no

limitation and a higher premium." *Id.* at 585, 559 *A.*2d 845. The insured was given the right to choose between two tort options under section 8. The first allowed recovery for non-economic losses (pain, suffering, and inconvenience) that fit into one of nine specified categories, and was known as the "verbal" or "lawsuit" threshold. The second choice was an unrestricted right to sue for recovery of non-economic damages. That option was referred to as a "zero dollar" or "no" threshold. *Id.* at 574–75, 559 *A.*2d at 848. The other significant change was to mandate a $250 medical deductible and a 20% copayment for medical expenses between $250 and $5,000. *Id.* at 585, 559 *A.*2d at 854. Thus, the Legislature guaranteed that in every automobile accident some medical expenses would not be paid by PIP.

The 1988 changes incorporated the mandatory copayments and deductibles into the wording of section 12:

> [E]vidence of the amounts collectible or paid pursuant to [*N.J.S.A.* 39:6A–4 and *N.J.S.A.* 39:6A–10] ... to an injured person, including the amounts of any *deductibles, copayments or exclusions* ... *otherwise compensated* is inadmissible in a civil action for recovery of damages for bodily injury by such injured person.
>
> The court shall instruct the jury that, in arriving at a verdict as to the amount of the damages for noneconomic loss to be recovered by the injured person, the jury shall not speculate as to the amount of the medical expense benefits paid or payable under section 4 to the injured person.
>
> *Nothing in this section shall be construed to limit the right of recovery, against the tortfeasor, of uncompensated economic loss sustained by the injured party.* (Emphasis added.)

That version of the statute forms the basis for Kelsey's claim for recovery of his PIP medical deductible and copayment.

To curtail costs, the Sponsor Statement for the 1988 amendments stressed the promotion of available and affordable auto insurance. *Sponsor Statement to Senate Bill No. 2637,* at 44 (1988). Insureds were required to carry medical-expense coverage over $75,000 "for one year and by the Unsatisfied Claim and Judgment Fund or a contract servicer during subsequent years with payment for coverage made at the time of motor vehicle registration." *Ibid.* The Statement reiterated that the purpose of that amendment was "to shift the costs of medical expenses to

available health insurance which is to become *primary coverage for automobile related medical expenses." Ibid.*

The shift from automobile insurance to other forms of health insurance for auto-accident medical expenses was not enacted without notice to the public. At the public hearings on the proposed amendments, Dr. Steven Lamazow, co-chair of More Educated Doctors in Courts and Legislation (MEDICAL), voiced his objections to an earlier, harsher version of the amendment that would have eliminated PIP:

> If some cost saving is necessitated within the PIP portion of the premium ... there should be at very least a minimum mandatory benefit, enough to *cover the large majority of medical bills and a provision for catastrophic injury.* The gap between these coverages would be taken up by *alternative forms of health coverage,* or the liability portion of the premium—*should the person be the one who was injured in the accident and not be at fault.*
>
> [*Senate Labor, Industry and Professions Committee on Auto Insurance Reform, Public Hearing,* at 54–55 (June 15, 1988) (emphasis added).]

Dr. Lamazow's concern for potential unmet costs was focused on cases involving catastrophic injury or medical expenses that might exceed upper limits on insurance. His concern for the "innocent" victim seems to have been quelled by the availability of alternative forms of health coverage beyond PIP. The legislative history does not address Kelsey's situation, involving an insured whose injury is minor and not catastrophic, and who has no alternative health insurance coverage.

During the public hearings before the 1988 amendments, Senator Cardinale and Richard Anderson of the Commerce and Industry Association of New Jersey discussed the business community's concerns about its increased contributions toward health care under the proposed legislation.

> *Senator Cardinale:* ... Suppose there were a compromise somewhere reached ... that the *first "X" dollars would continue to be covered under PIP, and that there would then be some kind of gap that would be covered by health insurance,* and that then we would have the catastrophic fund as we have today. No change, essentially, in the catastrophic fund ... Would you oppose that ...?
>
> *Mr. Anderson:* Well, I would say probably generally not. I'd have to see it specifically, obviously. But there might be something that might be compromised on that. There's a possibility of that.

*Senator Cardinale:* If we also included in that compromised portion *a deductible and co-payment, which would bring it into line with what we have in Blue Cross and Blue Shield in many instances, or with other health policies,* would that even more bring you on board with respect to that particular item?

*Mr. Anderson:* Well, let's take a look specifically at what we're talking about. I think we're open to any suggestions along that line, but we're opposed to just arbitrarily shifting the entire burden.

[*Id.* at 69–70 (emphasis added).]

The suggestion of the incorporation of deductibles and copayments "to bring [PIP] into line with what we have in Blue Cross and Blue Shield" indicates that the Legislature was aware that an insured would have to pay the below-deductibles under PIP just as an insured must pay such below-deductibles under Blue Cross and Blue Shield.

In its attempt to contain insurance costs, the Legislature reached a compromise in the 1988 amendments. PIP would provide for the prompt payment of most medical expenses, and the Unsatisfied Claim and Judgment Fund would provide payment for excessive amounts of medical expenses in the case of catastrophic injury. See *N.J.S.A.* 39:6A–4 (providing that insurer should pay reasonable medical expenses in excess of $75,000 but not in excess of $250,000 "in consultation with the Unsatisfied Claim and Judgment Fund Board and shall be reimbursable to the insurer from the Unsatisfied Claim and Judgment Fund"). However, by mandating the $250 deductible and the twenty-percent copayment, the Legislature guaranteed that in every automobile accident some medical expenses would not be paid under PIP. For those below-deductibles and copayments, the insured was responsible, either though the insured's other insurance coverage, or, if the insured had no other insurance, as in this case, out of the insured's own pocket.

In 1990, the Legislature once again amended the law. That amendment, *L.*1990, *c.* 8, entitled "Fair Automobile Insurance Reform Act of 1990," still emphasized "economy" as one of the "principal goals" of the no-fault system. The Act noted that that goal had not yet been achieved. *L.*1990, *c.* 8, § 2d. Kelsey's

accident, however, occurred before the 1990 amendments, and therefore, this case is governed by the 1988 version of the law.

Governor Thomas Kean expressed in his Veto Message to Senate Bill No. 2637 his interpretation of the intent of the Legislature in enacting the 1988 amendments to the No–Fault Law. In his statement, the Governor noted that "a viable 'no fault' insurance system requires a significant limitation on lawsuits." *Governor's Veto Message to Senate Bill No. 2637* (Aug. 4, 1988). Further the Governor declared that "the bill's essential purpose of closing the courthouse door to all lawsuits except those involving *bona fide* serious injuries will be diluted and the bill's effectiveness will be greatly diminished." *Ibid.*

Although emphasizing the importance of the prompt payment of medical costs, the Governor nonetheless stated:

> I do agree, however, that medical benefits should be subject to reasonable cost containment. Accordingly I support the deductibles, co-payments and medical fee schedule set forth in Senate Bill No. 2637 (3rd Reprint), except that the co-payment shall apply only to the first $5000 of coverage. Superimposing these traditional health system cost-containment mechanisms on PIP coverage will reduce fraud and over-utilization while maintaining the essential ingredient of providing adequate and complete health coverage without regard to fault.
>
> [*Ibid.*]

The Governor obviously did not believe that the Legislature intended that every insured could go to court to recover below-deductible expenses, the maximum, assuming that the insured had incurred medical expenses of $5,000, being $3,000 (if the insured had chosen a $2,500 deductible), or $1,200 (if the insured had chosen a $250 deductible). *See also Governor's First Annual Message, supra* (stating, "The minor automobile negligence case, which ultimately results in a judgment of settlement under $3000, is a significant contributing factor to the backlog in the civil courts.") Hence, from the inception of the no-fault statutory scheme, the Legislature intended to eliminate minor personal-injury-automobile-negligence cases from the court system. Kelsey's interpretation of section 12 would completely defeat that

purpose and would produce congestion in the court system once again with minor personal-injury claims, which here total $538.80.

## III

*No–Fault Case Law*

Although we have not previously addressed this specific section 12 issue, both this Court and the lower courts have interpreted various other provisions of the No–Fault Law. An examination of those cases indicates that our courts have consistently recognized that the No–Fault Law was intended to be a trade-off between the prompt payment of medical expenses, regardless of fault, and a restriction on the right of an injured party to sue a tortfeasor for minor personal injuries stemming from automobile accidents. Legislators had hoped that that trade-off would result in lower premiums and the elimination of a substantial number of cases from the calendar.

One of the earliest cases interpreting the No–Fault Law was *Pennsylvania Manufacturers' Ass'n Insurance Co. v. Government Employees Insurance Co.*, 136 *N.J.Super.* 491, 347 *A.*2d 5 (1975), *aff'd o.b.*, 72 *N.J.* 348, 370 *A.*2d 855 (1977). In that personal-injury case, the Appellate Division stated that the original legislation had been enacted to create an efficient and inexpensive method to reimburse victims for out-of-pocket expenses and to eliminate recovery for minor injury claims that did not involve more than the $200 threshold. *Id.* at 499, 347 *A.*2d at 9. Thus, the court recognized as major goals of the Legislature the elimination of minor claims and prompt aid to injured parties.

In *Smelkinson, supra,* 178 *N.J.Super.* at 467, 429 *A.*2d at 423, the Appellate Division reversed an order of the trial court that had barred plaintiff from recovering $4,500 worth of medical expenses. The court held that the plaintiff was entitled to recover PIP benefits, including medical expenses, because

[i]t is ... clear that the right thus afforded plaintiff by the No–Fault Law to recover her medical expenses directly from [the tortfeasor's insurer] was in substitution of her former right to recover them from the insured tortfeasor

himself and constituted, moreover, the exclusive remedy insofar as the medical expense claim arose out of the automobile accident.

[*Id.* at 469, 429 *A*.2d at 424.]

Thus, the court recognized the significance of the trade-off between the right to sue the tortfeasor for direct payment of medical expenses and direct payment by the insurer under the No–Fault Law.

In *Sotomayor v. Vasquez*, 109 *N.J.* 258, 536 *A*.2d 746 (1988), this Court stated that mandatory automobile insurance providing basic PIP benefits for the occupants of each car and the owner of the car's family had been "designed to provide quick and easy reimbursement for the basic personal costs most people incur when they are involved in an automobile accident." *Id.* at 261, 536 *A*.2d at 747. The Court stated that PIP's goal was the "early payment of bills without regard to a driver's fault" to serve three interconnected goals: controlling the increasing spiral of automobile-negligence cases, curtailing rising auto-insurance premiums, and easing court congestion. *Ibid.*

In *Aetna Insurance Co. v. Gilchrist Brothers, Inc.*, 85 *N.J.* 550, 428 *A*.2d 1254 (1981), the liability-insurance carrier, Aetna, initiated a suit against the tortfeasor seeking reimbursement of sums paid under the PIP endorsement. Citing to section 12, we interpreted the prohibition of the introduction of evidence of PIP payments as one that would "thereby prevent double recovery." *Id.* at 564, 428 *A*.2d at 1261. The fear of double recovery, *i.e.*, collecting PIP benefits and recovering through a civil action, had been the earliest concern about cost control before the cost of PIP itself became an issue in 1988.

Fears of double recovery resurfaced in *Amaru v. Stratton*, 209 *N.J.Super.* 1, 506 *A*.2d 1225 (1985), another personal-injury action. There, the Appellate Division cited section 12 and *Smelkinson, supra,* for the proposition that the Legislature intended no-fault insurance to be the exclusive remedy for claims arising out of an automobile accident. *Id.* at 8, 506 *A*.2d at 1228. The Appellate Division also reiterated the point made in *Aetna, supra,* and

*Cirelli v. Ohio Casualty Insurance Co.*, 72 *N.J.* 380, 387, 371 *A.*2d 17, 21 (1977), that evidence of PIP benefits collectible or paid to an injured party was inadmissible under the statute to prevent that party from being "unduly enriched by double recovery of [medical] expenses." *Ibid.; see also Wilson v. Unsatisfied Claim & Judgment Fund Bd.*, 109 *N.J.* 271, 281, 536 *A.*2d 752, 757 (1988) (stating, "If there is one definite principle that emerges from our PIP law, policy, and precedent, it is that there shall be no double recovery of PIP benefits"); *Lattimer v. Boucher*, 189 *N.J.Super.* 33, 38, 458 *A.*2d 528, 530–31 (Law Div.1983) (stating that New Jersey strongly disapproves of double recovery by accident victims); *Bernick v. Aetna Life & Casualty*, 158 *N.J.Super.* 574, 582, 386 *A.*2d 908, 912 (Cty.Ct.1978) (stating same).

In sum, courts have held that PIP benefits are strictly excluded from a civil suit by the injured party to serve a variety of goals: easing court congestion, lowering automobile-insurance premiums, and prohibiting double recovery of PIP expenses. Although Kelsey's case does not involve double recovery, we conclude that under no-fault the parties have traded lower premiums and prompt payment of medical expenses for a restriction on their right to sue.

## IV

*Arguments of the Parties*

Kelsey's main argument is that the plain language of section 12 "specifically and unequivocally provides that the injured party's right of recovery of uncompensated loss from the tortfeasor *should not be limited* * * *." Also, Kelsey points to the plain language of section 8 to refute the Appellate Division's argument that the recovery of economic loss hinges on the ability to recover non-economic loss, defined in *N.J.S.A.* 39:6A–2 as "pain, suffering and inconvenience."

Kelsey's final argument in support of his reading of the No–Fault Law is an equitable one. According to Kelsey, the third

paragraph of section 12 demonstrates that the Legislature intended that an innocent victim should not suffer financially.

Roig contends, on the other hand, that Kelsey's position conflicts with the terms and the purposes underlying the No–Fault Law. He argues that the Legislature's purpose in enacting that law was to eliminate from an overburdened court system minor bodily-injury claims arising from automobile accidents and to reduce insurance premiums inflated by those claims. Roig warns that Kelsey's interpretation would completely defeat those goals and would bring every single one of those minor claims back into the court system.

If an insured chooses a $1,000 or $2,500 deductible in exchange for a premium reduction, the Legislature, clearly, did not intend that that insured would be able to sue the tortfeasor for the below-deductibles. Under that logic, insureds choosing the highest deductible would have the best deal: the lowest premium and the right to recover the excluded expenses in court against the tortfeasor. Although not as evident in the case of an insured like Kelsey's sister who had to take the mandatory deductible and copayment as in the case of an insured who chose a higher deductible, the economic reality for both insureds is the same. Kelsey's sister, like all New Jersey motorists, paid a lower annual insurance premium because of the mandatory PIP medical deductible and copayment. To allow a claim for the deductible and the copayment would be antithetical to the entire No–Fault statutory scheme. That kind of recovery could be available only if the Legislature reinstituted a fault-based system.

As further support for his position, Roig refers to the No–Fault Laws of Kentucky and Florida, which prohibit an injured party from recovering below-deductible expenses from a third party. These comparisons are unpersuasive. Neither of those statutes is authoritative in the interpretation of the New Jersey No–Fault Law.

Although no express provision to compensate under-insured victims for their out-of-pocket expenses incurred through deduct-

ibles and copayments exists, we agree with Kelsey that the plain language of section 12 does suggest that the amount of the deductible and copayment "otherwise compensated" is inadmissible. We disagree, however, with Kelsey's further assertion that the statute therefore permits recovery from the "tortfeasor" of the injured party's unpaid medical expenses due to those deductibles and copayments. Such an interpretation is contrary to the clear legislative intent of the No–Fault Law.

Likewise, we conclude that the Appellate Division's determination, which sought a middle ground between the positions of the parties, is contrary to the manifest intent of the Legislature. We believe that the Appellate Division's interpretation must yield to the overriding theme evidenced in the legislative history of the No–Fault Law, especially in the 1988 amendments.

## V

*Legislative Intent Controls Over Plain Language*

In the interpretation of a statute our overriding goal has consistently been to determine the Legislature's intent in enacting a statute. *Lesniak v. Budzash,* 133 *N.J.* 1, 626 *A.*2d 1073 (1993). We are convinced that the Legislature did not intend that the insured could sue the tortfeasor for the minor amounts of unpaid deductibles and copayments.

Our conclusion is reinforced by Judge Learned Hand's classic admonition that "[t]here is no surer way to misread any document than to read it literally." *Guiseppi v. Walling,* 144 *F.*2d 608, 624 (2d Cir.1944). As we observed in *Schierstead v. Brigantine, supra* [29 *N.J.* 220, 148 *A.*2d 591 (1959)], "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.'" 29 *N.J.* [220] at 230, 148 *A.*2d [591] at 596 (quoting *Morris Canal & Banking Co. v. Central R.R. Co.,* 16 *N.J.Eq.* 419, 428 (Ch.1863)).

[*State v. State Troopers Fraternal Ass'n,* 134 *N.J.* 393, 418, 634 *A.*2d 478, 492 (1993).]

As noted by the trial judge in the instant matter, we posited in *Kimmelman v. Henkels & McCoy, Inc.,* that "[i]n discerning that [legislative] intent we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part." 108 *N.J.* 123, 129, 527 *A.*2d 1368, 1371 (1987). *See also*

*New Jersey Builders, Owners, & Managers Ass'n v. Blair,* 60 *N.J.* 330, 338, 288 *A.*2d 855, 859 (1972) (stating, "In reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted ..."); *Wollen v. Fort Lee,* 27 *N.J.* 408, 418, 142 *A.*2d 881, 886 (1958) (stating, "The inquiry [into statutory meaning] in the ultimate analysis is [to determine] the true intention of the law; and, to this end, the particular words are to be made responsive to the essential principle of the law. It is not the words but the internal sense of the law that controls ..."). We cannot lose sight of the overwhelming goals of reducing court congestion and lowering the cost of automobile insurance.

We are satisfied that the Legislature never intended to leave the door open for fault-based suits when enacting the No–Fault Law. If we adopted Kelsey's reading of the statute, courts would again feel the weight of a new generation of congestion-causing suits, and automobile-insurance premiums would again rise. If the Legislature disagrees with our interpretation of its intent, it is, of course, empowered to enact clarifying legislation.

We reverse the judgment of the Appellate Division.

*For reversal*—Chief Justice WILENTZ and Justices GARIBALDI, CLIFFORD, HANDLER, POLLOCK, O'HERN, and STEIN–7.

*Opposed*—none.