708 A.2d 708

NEW JERSEY STATE LEAGUE OF MUNICIPALITIES, AN ORGA-NIZATION OF MUNICIPALITIES; BOROUGH OF ELMER, A MUNICIPAL CORPORATION; TOWNSHIP OF PLAINSBORO, A MUNICIPAL CORPORATION; CITY OF PATERSON, A MU-NICIPAL CORPORATION; GEORGE FERENSICK, AN INDI-VIDUAL; ET AL.,[1] APPELLANTS, v. DEPARTMENT OF COM-MUNITY AFFAIRS AND JANE M. KENNY, COMMISSIONER, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 19, 1997—Decided March 16, 1998.

---

[1] Due to the extensive number of other individual appellants (157), we have omitted their names from the caption.

Before Judges MUIR, Jr., CUFF, and STEINBERG.

*Stuart R. Koenig* argued the cause for appellants (*Stickel, Koenig & Sullivan,* attorneys; *Mr. Koenig,* on the brief).

*Keith A. Costill,* Deputy Attorney General, argued the cause for respondents (*Peter Verniero,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Mr. Costill,* on the brief).

*Hill Wallack*, attorneys for amicus curiae New Jersey Builders Association (*Thomas F. Carroll, III,* on the brief).

The opinion of the court was delivered by

MUIR, Jr., J.A.D.

Appellants, representing interests of this State's 567 municipalities, challenge the facial validity of regulations for residential site improvement standards promulgated by the Department of Community Affairs (DCA) under the Residential Site Improvement Standards Act (Act). *N.J.S.A.* 40:55D–40.1 to –40.7. At issue is whether the DCA acted within its delegated authority when it promulgated the regulations. Relying on the zoning power statutorily vested in municipalities and language in the Act, appellants primarily argue the regulations are invalid because they impermissibly intrude on municipal zoning power. Alternatively, they contend certain regulations exceed the DCA's express authority under the Act. We find the regulations facially valid except for *N.J.A.C.* 5:21–1.5b, which is invalid due to its inconsistency with a Department of Environmental Protection (DEP) regulation.

*I*

The New Jersey Constitution vests the Legislature with the authority to enact general laws under which municipalities may adopt zoning ordinances. *N.J. Const.* art. IV, § 6, ¶ 2. Pursuant to that authorization, the Legislature enacted prior legislation and the current Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –129, which authorizes municipalities to adopt ordinances to establish for particular uses reasonable standards for provision of adequate physical improvements, including off-street parking, roadways, and water, sewage, and drainage facilities. *See N.J.S.A.* 40:55D–65d.

The proliferation of municipal residential site improvement standard ordinances that evolved from that authorization was the stimulus for the Act. The proliferation, with its attendant lack of uniformity, had led to increased costs in residential construction

without commensurate gains. *See N.J.S.A.* 40:55D–40.2a. Municipalities clothed with the authority to zone had engendered such a variety of standards in their ordinances that the Legislature found the need to supplant their discretionary design standards with objective residential site improvement standards. *See N.J.S.A.* 40:55D–40.2d.

To reach that goal, the Legislature prescribed a format for enactment of the desired uniform regulations dealing with the technical site improvement standards for residential development. *See N.J.S.A.* 40:55D–40.2e. The Act authorized the establishment, and prescribed the composition, of a Site Improvement Advisory Board (Board). *See N.J.S.A.* 40:55D–40.3. It charged the Board with implementing a uniform set of standards to be recommended to the DCA Commissioner for promulgation as regulations to supersede all municipal ordinances prescribing residential subdivision and site improvement standards. *N.J.S.A.* 40:55D–40.3, – 40.4, –40.5.

The Act gave the Board precise direction for implementing the recommended standards. It mandated the Board implement the recommended site improvement standards consistent with Article Six and the appended exhibits of the "Model Subdivision and Site Plan Ordinance" (Model Ordinance) prepared by the Rutgers Center for Urban Policy Research. *N.J.S.A.* 40:55D–40.4a. Where inconsistency between the MLUL and the Model Ordinance occurred, the Act directed the Board to follow the Model Ordinance. *Ibid.* The Model Ordinance recommendations had to be disregarded only when they were inconsistent with requirements of other laws. *Ibid.*

The Board, however, had the authority to deviate from the Model Ordinance recommendations. The Act vested the Board with the authority to replace or modify Model Ordinance standards if those deviations were supported by professional or other authoritative sources. *Ibid.* In another section, the Act provided that nothing contained in it "shall in any way limit the zoning

power of any municipality." *N.J.S.A.* 40:55D–40.6. It is the latter provision which fuels appellants' primary contention.

A

Article Six of the Model Ordinance is entitled "Improvement Standards." Its purpose is to provide desirable living environments in residential developments without unnecessarily adding to development costs. Like the Act which defines "site improvements" as streets, roads, parking facilities, sidewalks, drainage structures, and utilities, *N.J.S.A.* 40:55D–40.1, the Model Ordinance identifies streets and circulation, off-street parking, water supply, sanitary sewers, and storm water management as required improvements. *N.J.A.C.* 5:21–1.4.

Generally, the Model Ordinance delineates the standards for the designing, planning, and constructing of residential improvements. In some instances, such as sanitary sewers, the standards extend to modification and operation of treatment works.

The Rutgers Center document delineates standards for each required improvement. Under the street category, it classifies streets into a hierarchical system based essentially on intensity of use definitions for each type. The Model Ordinance language and exhibits attached identify the street classification criteria for right-of-way profiles and for construction specifications. Some exhibits specifically address standards for relative strengths of paving materials and for subgrade evaluation. Others set out model pavement sections for the different categories of streets based on such factors as the quality of the subgrade. The Model Ordinance also factors in topographical conditions as part of the construction criteria.

Within the general street category, the Model Ordinance prescribes standards for design and construction of cartway width (traveled way), curbs and gutters, shoulders, sidewalks, bikeways, utility and shade tree areas, measurement of right-of-way, street grade and intersections, pavement design and thickness, lighting, underground wiring for all utilities, and signs. Some of these

standards are correlated with street classifications. Again, there are exhibits which not only identify profiles but also identify the construction specifications for each of the enumerated improvements. Similar standards with extensive detail set out in language and exhibits are provided for design and construction of facilities for off-street parking, water supply, sanitary sewers, and storm water management.

Overall, the Model Ordinance provides a comprehensive set of standards to guide municipal agencies responsible for granting residential subdivisions and site plans. The standards extend far beyond construction specifications on the materials to be used and specifications on the manner of installation. At the same time, the Model Ordinance embodies recognition of factors that may be considered to relax its standards.

## B

The Board held a number of meetings and conducted a comprehensive review of the Model Ordinance. In the course of its review, the Board considered extensive comments and testimony by developers, artisans, engineers, contractors, suppliers of construction materials, municipalities, planning boards, school boards, other municipal officials, and other interested organizations. The Board also considered reports, treatises, and documents propounded by organizations with authoritative expertise on site improvement standards. *See N.J.S.A.* 40:55D–40.4a.

The Board thereafter presented its recommended residential site improvement standards to the Commissioner. The standards predominantly followed the Model Ordinance and its exhibits. They also contained some variations from the Model Ordinance.

In subchapter three, the recommended regulations provide for exceptions, waivers, and special area standards. Essentially, the subchapter builds in a flexibility for special circumstances confronted in a residential development. It establishes a waiver process consonant with the dictates of the Act. *N.J.S.A.* 40:55D–40.4c. It also prescribes a procedure by which an appropriate

municipal agency may grant *de minimis* exceptions from the regulations' requirements for residential improvements. Finally, after noting that both the Board and the Commissioner recognized "the need for preservation and/or enhancement of community character in New Jersey municipalities," the regulations under the special exceptions category "provide a procedure whereby a municipal [agency] may develop and recommend to the Board supplementary and/or alternative standards in the form of municipal ordinances for review and amendment to this Chapter."

Prior to publication of the proposed regulations as required by the Administrative Procedure Act, *see N.J.S.A.* 52:14B–1 to –15, the Commissioner, consonant with statutory authority, added *N.J.A.C.* 5:21–4.5(b), which requires installation of sidewalks under certain conditions. In doing so, the Commissioner relied on a treatise by the U.S. Department of Transportation Federal Highway Administration on the subject of sidewalks. She also relied upon comments and information from various interest groups. The Commissioner found the additional sidewalk standards were necessary to avoid a danger to public safety. *See N.J.S.A.* 40:55D–40.4b. The DCA's adoption of the regulations, as modified, led to this appeal.

## II

Appellants first contend the regulations promulgated must be invalidated and remanded to the DCA for rewriting consistent with what they perceive to be the Act's legislative intent. Fortified by the Act's pronouncement that "[n]othing contained in this act shall in any way limit the zoning power of any municipality," *N.J.S.A.* 40:55D–40.6, they contend the regulations, as written, exceed the Act's intent and impermissibly intrude on the municipal zoning power. In essence, their contention is that because *N.J.S.A.* 40:55D–65d empowers municipal adoption of an ordinance to "[e]stablish, for particular uses[,] ... reasonable standards ... for the provision of adequate physical improvements," the DCA promulgated regulations improperly limit the zoning power of

municipalities. However, essentially conceding a legislative intent to modify municipal zoning authority under *N.J.S.A.* 40:55–65d, the appellants argue the DCA regulations must be limited to technical construction details only, that is, limited to specifying the types of materials and their in-ground and in-place manner of installation. They find support for the latter contention in the word "technical" as set out in *N.J.S.A.* 40:55D–40.2e. It reads, "[t]he goal of streamlining the development approval process by improving the efficiency of the application process is best served by the establishment of a uniform set of technical site improvement standards for land development...." *N.J.S.A.* 40:55D–40.2e. We reject the contentions.

Agency regulations are presumptively valid, and anyone challenging them has the burden of proving their invalidity. *Medical Soc'y v. New Jersey Dep't of Law and Public Safety,* 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990). The presumption of validity attaches if the regulations are within the authority delegated and not on their face beyond the agency's power. *Ibid.* However, administrative regulations cannot alter the terms of a statute or frustrate the legislative policy. *Ibid.* Nonetheless, appellate courts must place " 'great weight on the interpretation of legislation by the administrative agency to whom its enforcement is entrusted.' " *Id.* at 26, 575 *A.*2d 1348 (quoting *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 69–70, 389 *A.*2d 465 (1978)).

Our search for the scope of the DCA's delegated authority begins with the terms of the Act. Those terms generally demonstrate a legislative intention to vest the DCA with authority to promulgate the regulations under attack. Were it not for the language of *N.J.S.A.* 40:55D–40.6, the scope would be indisputable. The language of *N.J.S.A.* 40:55D–40.6 that nothing contained in the Act shall in *any* way limit any municipal zoning power, interjects an ambiguity that requires us to construe the statute to determine the legislative intent. In doing so, we are mindful that "[m]unicipalities do not possess the inherent power to zone, and they possess that power, which is an exercise of the police power,

only insofar as it is delegated to them by the Legislature." *Riggs v. Township of Long Beach,* 109 *N.J.* 601, 610, 538 *A.*2d 808 (1988).

The clearest indication of a statute's meaning is its plain language. *National Waste Recycling, Inc. v. The Middlesex Cty. Improvement Auth. and Waste Management of N. Jersey,* 150 *N.J.* 209, 223, 695 *A.*2d 1381 (1997). Beyond that, in times when plain language creates uncertainties, courts must construe the statute in a manner that best effectuates the Legislature's intent. *State v. Szemple,* 135 *N.J.* 406, 422, 640 *A.*2d 817 (1994). The general intent of the statute controls the interpretation of its parts. *Ibid.* " '[S]tatutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as "consonant to reason and good discretion." ' " *Roig v. Kelsey,* 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994) (quoting *Schierstead v. Brigantine,* 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959) (quoting *Morris Canal & Banking Co. v. Central R.R.,* 16 *N.J. Eq.* 419, 428 (Ch. 1863))). Moreover, when legislative intents of two apparently conflicting statutes dealing with the same subject are at issue, courts are enjoined to reconcile conflicts and read the laws as consistent to give effect to both expressions of the Legislature's purpose. *See In re Schuman,* 114 *N.J.* 14, 25, 552 *A.*2d 602 (1989); *Henninger v. Board of Chosen Freeholders of Bergen,* 3 *N.J.* 68, 71, 68 *A.*2d 833 (1949). The latter premise finds support in the reasoning that our Legislature is familiar with its laws, and it is presumed that new enactments are construed to serve a useful and consistent purpose. *Jacobs v. New Jersey Highway Auth.,* 54 *N.J.* 393, 401, 255 *A.*2d 266 (1969).

The Act's plain language unequivocally mandates the Board adhere to the Model Ordinance for implementation of the residential improvement standards that the Board was to recommend to the DCA Commissioner for adoption. The mandate is demonstrated by the use of the word "shall" in *N.J.S.A.* 40:55D–40.4. *Harvey v. Board of Chosen Freeholders of Essex Cty.,* 30 *N.J.* 381, 391–92, 153 *A.*2d 10 (1959). Beyond that, the Act directs the Model Ordinance shall prevail over the MLUL where inconsisten-

cies between the two arise and shall supersede any existing municipal site improvement ordinance. *See N.J.S.A.* 40:55D–40.4, –40.5.

The Model Ordinance deals with a plethora of criteria for determining the need and appropriateness of residential development improvements. To that extent, it appears inconsistent with the provisions of *N.J.S.A.* 40:55D–65d, if that statute is given the literal interpretation appellants endorse. Yet, such literalism runs counter to the legislative rationale for the Act as reflected in its findings. *See N.J.S.A.* 40:55D–40.2. Prompted by the need to curtail the detrimental effects of the excessively costly standards engendered by multiplicity of municipal ordinances enacted under the authority of *N.J.S.A.* 40:55D–65d and its predecessor provisions, the Legislature made the Model Ordinance recommendations, subject to limited variations, *the* controlling residential improvement standards to guide the Board. The Board consequently, by the Act's plain language, was required to implement the Model Ordinance standards that directly relate to cost-generating factors and extend to all essential aspects of residential subdivision and site plan improvements; a clear general intent that the DCA regulations, as promulgated, are within the Act's delegated authority. It is this general intent that controls the Act's parts and requires us to read the Act sensibly rather than literally to avoid the inconsistency suggested by appellants' contentions. *See State v. Szemple, supra,* 135 *N.J.* at 422, 640 *A.2d* 817.

Appellants rely on the literalism of *N.J.S.A.* 40:55D–40.6 and its "[n]othing contained in this act shall in any way limit" phraseology. That phraseology when read in juxtaposition to *N.J.S.A.* 40:55D–65d suggests *any* regulations promulgated by the DCA would countervail municipal authority to enact ordinances for residential improvements. Clearly, that cannot have been the legislative intent, so we turn to alternative statutory construction criteria to determine if compatibility can be found between the Act and *N.J.S.A.* 40:55D–65d.

We are enjoined to find consistency when the legislative intents of two statutes on the same subject appear conflicting. *See In re Schuman, supra,* 114 *N.J.* at 25, 552 *A.*2d 602. Consistency between the Act and *N.J.S.A.* 40:55–65d precludes a conclusion the promulgated regulations constitute a limit on municipal zoning power. We conclude such consistency exists. The consistency is found when it is recognized that, through the Act, the Legislature has modified but not limited municipal zoning power. In essence, the Legislature has provided another reasonable means for municipal participation in establishment of residential improvement standards called for in *N.J.S.A.* 40:55D–65d. Under the Act, municipalities simply share in that establishment. By sharing, no consequential limitation is placed on their zoning power.

The Act and *N.J.S.A.* 40:55D–65d have the same purposes. To that extent, their controlling intents are identical. The Act's purposes are reflected in the legislative findings. The overriding import of those findings is the need for reasonable, cost-effective standards. The MLUL reflects similar goals. In *N.J.S.A.* 40:55D–65d, the MLUL vests municipalities with authority to adopt ordinances to establish reasonable standards for, among other things, the provision of adequate physical improvements. In essence, this joint goal then is to establish reasonable physical improvement standards to protect the public health, safety, and welfare.

Standards are established not only by drafting regulatory codes but also by implementation and application of the codes. Under the Act, municipalities, through their planning boards, will establish reasonable standards through the implementation and application of the legislatively mandated improvement standards promulgated by the DCA. To that extent, municipalities will continue to have the power to participate in the establishment of residential subdivision and site plan improvement standards through the planning boards' jurisdiction of proposed developments. Viewed in that context, a fair reading of the Act authorizes promulgation of regulations that modify the manner for implementation of

reasonable residential improvement standards, a modification authorized by the state constitution, *see N.J. Const.* art. IV, § 6, ¶ 2, and a modification that does not limit the zoning power of any municipality. *See N.J.S.A.* 40:55D–62, –65a, b, c.

Beyond that, the promulgated regulations support the directive of *N.J.S.A.* 40:55D–40.6. In subchapter three, which provides for, among other things, special area standards, municipal planning boards "may develop and recommend to the Board supplementary and/or alternative standards in form of municipal ordinances for review and amendment to the special area standards." *N.J.A.C.* 5:21–3.5. The special area standards are designed to deal with a distinctive character or environmental feature that a municipality has identified and wants to preserve or enhance. *See N.J.A.C.* 5:21–3.5. The clear design of this subchapter then is to satisfy the purpose of the MLUL to encourage municipal action to guide the appropriate development of its land. *See N.J.S.A.* 40:55D–2a. We are persuaded that this also fosters the legislative mandate not to limit municipal zoning power.

■ Nonetheless, appellants argue the Act requires the promulgated regulations be restricted to technical construction specifications, such as materials employed and their in-ground installation. They find support for this contention in the word "technical" set out in *N.J.S.A.* 40:55D–40.2e. We conclude the contention is contrary to the Act's purposes as reflected by the legislative finding, the ordinary meaning of the word "technical," and the clear implications of the Act's express language. To rule otherwise would not best effectuate the legislative intent in a manner consonant with reason and common sense. *See Roig, supra,* 135 *N.J.* at 515, 641 *A.*2d 248.

■ The most profound failing of appellants' argument is that it overlooks the cost-producing magnitude of improvements for residential development. Improvement specifications as they relate to types of materials and manner of installation are but one aspect of cost generation in a residential development. The detailed standards contained in the Model Ordinance cover a

greater array of cost-producing elements. Since the legislative purpose was to place restrictions upon discretionary, nonobjective, and excessive cost-producing improvement construction standards created by municipal ordinances, lack of inclusion of the greater number of cost-producing improvement standards would eviscerate the Act's unambiguously expressed purpose. Courts cannot construe legislation in a manner which countervails such a clearly expressed purpose. *Strasenburgh v. Straubmuller*, 146 *N.J.* 527, 541, 683 *A.*2d 818 (1996).

One more fallacy in appellants' argument is that it overlooks the well-settled principle that words of a statute must be given their plain meaning. *See Great Atlantic and Pacific Tea Company v. Borough of Point Pleasant*, 137 *N.J.* 136, 143, 644 *A.*2d 598 (1994); *Levin v. Township of Parsippany–Troy Hills*, 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). Appellants' restrictive contention overlooks the plain meaning of the word "technical." The word's primary and principal definition is "[p]ertaining to some particular art, science, or trade." *Funk & Wagnalls New Comprehensive Int'l Dictionary of the English Language* 1287 (Encyc. ed.1978). That definition provides a breadth beyond appellants' narrow view. It relates to the whole science of residential development improvements. In the broader concept, technical site improvement standards encompass the continuum of factors, generally unknown to the lay person but articulated in the Model Ordinance.

Finally, appellants' restrictive definition of "technical" introduces a view that overlooks the clear implications of the Act's express language. The Legislature in making the Model Ordinance the controlling guidelines for standards to be implemented specifically referred to the exhibits appended to the Model Ordinance. *N.J.S.A.* 40:55D–40.4a. Those exhibits, as noted, prescribe a great deal more than the construction specifications appellants advocate. Consequently, we are not persuaded by appellants' perceived restrictive legislative intent.

In sum, we conclude the controlling legislative intent of the Act is, when its plain words and purposes are viewed in a common

sense manner, that the DCA generally had the authority to promulgate the regulations under attack. We are not dissuaded from our conclusion by appellants' contention the Legislature intended otherwise by its inclusion of *N.J.S.A.* 40:55D–40.6. If the Legislature disagrees with our interpretation, it is, of course, empowered to enact clarifying legislation. *Roig, supra,* 135 *N.J.* at 516, 641 *A.*2d 248.

### III

We now turn to appellants' contentions the DCA violated its delegated authority when it promulgated certain regulations inconsistent with the Model Ordinance. Appellants identify fifteen regulations "by way of example but not by way of limitation" where they claim the Board recommended standards that deviated from the Model Ordinance which were not supported by authority of an academic or professional institution as required by *N.J.S.A.* 40:55D–40.4a. Our review of the record, in the context of applicable principles of law, satisfies us the contentions must be rejected.

Certain highly circumscribed standards control our scope of review. *See Lower Main St. Assocs. v. New Jersey Hous. and Mortgage Fin. Agency,* 114 *N.J.* 226, 236, 553 *A.*2d 798 (1989). An administrative regulation is deemed presumptively valid, and the burden is on the challenger to demonstrate the regulation exceeds the delegated authority. *See Dougherty v. Department of Human Servs.,* 91 *N.J.* 1, 6, 449 *A.*2d 1235 (1982); *Consolidation Coal Co. v. Kandle,* 105 *N.J.Super.* 104, 118, 251 *A.*2d 295 (App.Div.), *aff'd o.b.,* 54 *N.J.* 11, 252 *A.*2d 403 (1969). The grant of authority to an administrative agency must be liberally construed in order to enable the agency to accomplish its statutory purpose, and courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562, 384 *A.*2d 795 (1978). Moreover, administrative agencies have wide discretion in the exercise of their responsibility, in part because they have the expertise to understand and solve the

specialized problems that develop in the course of promulgating regulations directed by legislative enactment. *See Bergen Pines Cty. Hosp. v. New Jersey Dep't of Human Servs.*, 96 *N.J.* 456, 474, 476 *A.*2d 784 (1984).

Applying these well-settled principles, we discern no basis for concluding the fifteen challenged regulations should be invalidated. To begin with, we find eight of the regulations that deviate from the Model Ordinance specifically supported by authoritative sources. As to the remaining seven, *N.J.A.C.* 5:21–4.2(c), –4.3(f), – 4.4(d), –4.5(g), –4.8, –4.9, and –4.14(d), we are satisfied there is sufficient generalized data in the record, when combined with the recognized expertise of the Board members and the incidental powers of the Board, to conclude appellants' generalized attack on the regulations fails to overcome the presumption of validity. The seven regulations challenged deal with highly technical standards for construction of residential development improvements. Appellants urge that we find the deviations, which are very minor in nature, beyond the scope of the DCA's delegated authority. We cannot on this record sustain appellants' generalized challenge. The Board members with their expertise are better equipped to recognize in authoritative sources the particulars justifying the minor modifications or replacements they recommended. Moreover, we will not hinder the DCA's ability to carry out the Legislature's intent by engaging in judicial hair splitting. We consequently affirm the fifteen challenged regulations.

*IV*

The next issue raised relates to a conflict between a DCA storm water management regulation and one promulgated by the DEP. Site improvement standards set out in *N.J.A.C.* 5:21–7.1 to –7.6 establish a complete design manual for storm water management. The Storm Water Management Plan, *N.J.S.A.* 40:55D–93 to –99, delegates to the DEP the authority to regulate storm water management. The conflict relates to which standards a municipality must follow regarding storm water management.

DEP regulation *N.J.A.C.* 7:8–1.1 provides the DEP standards are the minimum that municipalities must follow when dealing with storm water management. In contrast, DCA regulation *N.J.A.C.* 5:21–1.5(b) provides that the site improvement standards are the minimum required to insure public health and safety and the maximum required in connection with granting residential development approval.

DCA essentially concedes the conflict. However, it contends a proposed amendment to DEP regulations will alleviate the conflict. It accordingly argues, since the amendment will eventually eradicate the conflict, we should not invalidate *N.J.A.C.* 5:21–1.5(b) but allow circumstances to take their course. We reject the argument and invalidate the regulation.

DCA's argument, if accepted, would require us to speculate as to what may occur. Courts may not engage in speculation as to what may occur. *See Manhattan Overseas Co. v. Camden Cty. Beverage,* 125 *N.J.L.* 239, 245, 15 *A.*2d 217 (Sup.Ct.1940), *aff'd,* 126 *N.J.L.* 421, 19 *A.*2d 828 (E. & A.1941). The validity of regulations, like the validity of statutes, must be determined in a present context and not some prospective context. *See Robinson v. Cahill,* 69 *N.J.* 449, 455, 355 *A.*2d 129, *opinion supplemented by* 70 *N.J.* 155, 358 *A.*2d 457 (1976).

Furthermore, the DCA's authority to promulgate regulations for residential improvement is controlled by the Act. One of the limitations on that authority is:

> Nothing in this act shall be construed to prohibit, preempt or in any way affect the exercise of any authority by the State or any county government with respect to site improvements conferred by any other State law or regulation promulgated thereunder.

[*N.J.S.A.*40:55D–40.7b]

Given that limitation, the conflict noted dictates the invalidation of *N.J.A.C.* 5:21–1.5(b). Good intentions do not always come to fruition.

The matter is remanded to the DCA for resolution of the conflict or enactment of an appropriate modification to its regulation.

## V

Appellants' remaining challenges to the regulations we find to be clearly without merit. *See R.* 2:11–3(e)(1)(D), (E). In particular, we find the *de minimis* waiver regulation and the regulation governing enforcement of the standards to be well within the implied powers delegated to the DCA. *See In re Loans of the N.J. Property Liab. Ins. Guar. Ass'n,* 124 *N.J.* 69, 79, 590 *A.*2d 210 (1991).

## VI

In sum, we deem the regulations facially valid except for *N.J.A.C.* 5:21–1.5(b), which is declared invalid. The matter is remanded to the DCA for resolution of the conflict or enactment of an appropriate modification to the invalidated regulation.