936 A.2d 476

JOHN BARDIS AND HELEN BARDIS, HIS WIFE, PLAINTIFFS–APPELLANTS v. FIRST TRENTON INSURANCE CO., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 23, 2007—Decided December 20, 2007.

140

Before Judges SKILLMAN, WINKELSTEIN and YANNOTTI.

*David T. Wheaton,* argued the cause for appellants (*Levinson Axelrod,* attorneys; *Mr. Wheaton,* on the brief).

*Stephen A. Rudolph,* argued the cause for respondent (*Monte & Rudolph,* attorneys; *Mr. Rudolph,* on the brief).

The opinion of the court was delivered by

WINKELSTEIN, J.A.D.

On February 13, 1997, plaintiff John Bardis was involved in an

automobile accident.[1] After settling with the tortfeasor, he instituted this underinsured motorist (UIM) claim against defendant, First Trenton Insurance Company, his automobile insurance carrier. Defendant conceded that the driver who caused the accident, Joseph Bologna, was negligent. Because plaintiff suffered from degenerative disc disease and had been in prior and subsequent automobile accidents that had caused him back pain, the case was tried to a jury on proximate cause and damages, primarily with regard to plaintiff's herniated disc at L4–5. The jury concluded that plaintiff's injuries were not proximately caused by the February 1997 accident.

On appeal, plaintiff raises a number of issues. Among them is the novel question of whether, as support for his claim that his injuries were proximately caused by the accident, he is entitled to present evidence that his insurance carrier paid personal injury protection (PIP) benefits for medical expenses he incurred following the accident.[2] For evidentiary and public policy reasons, we hold that evidence that an insurance carrier paid PIP payments on an insured's behalf is not admissible in a UIM case to establish that the accident was a proximate cause of the insured's injuries. For that and other reasons, we affirm the final judgment in favor of defendant.

We begin with the trial evidence. Plaintiff had been involved in an automobile accident in 1991. He testified that he was driving twenty to thirty miles an hour on the Garden State Parkway when he was struck from the rear, causing him to hit the car in front of him. He sought treatment for his injuries until sometime in 1992. Medical records showed that he suffered pain radiating into both legs and he was unable to stand or sit. Plaintiff testified that he was symptom-free from 1992 until the February 1997 accident, but

---

[1] Plaintiff Helen Bardis's per quod claim has been voluntarily dismissed.

[2] Evidence of medical expenses paid under PIP are not otherwise admissible by the injured party in a civil trial for damages. *See Roig v. Kelsey*, 135 *N.J.* 500, 513, 641 A.2d 248 (1994).

a 1998 doctor's report indicates that he had a prior back injury "four or five years" earlier, presumably referring to the 1991 accident, from which he had residual symptoms.

Plaintiff owns and works at the Golden Bell Diner in Freehold. In February 1997 he was involved in the three-car accident that is the subject of this lawsuit. His car was stopped while he was waiting to turn into the diner parking lot. A car operated by John Tague was stopped behind him. According to Tague, the car behind him, driven by Bologna, struck Tague's car, causing it to strike plaintiff's car. Plaintiff testified that his vehicle sustained approximately $3000 in damages.

Plaintiff asserted that his left shoulder did not strike his vehicle, but his left knee struck the bottom of the dashboard. A portion of his forehead, above his left eye, struck the ceiling of the inside of the car. He refused medical treatment at the scene. Following the accident, he drove the car into the diner parking lot and stayed at work for "a couple of hours" before going home. All parties to the accident drove their vehicles from the accident scene.

The next day, plaintiff went to the emergency room complaining of pain in his back, left shoulder, left knee and neck. An examination revealed tenderness in his neck, back spasms, and limitation of motion of his shoulder and knee. X-rays were substantially negative, but his low back showed mild degenerative spurs indicating a preexisting, degenerative condition.

Before the accident, since 1985, plaintiff had worked seven days a week at the diner as a chef, which required him to lift heavy objects. Following the accident, he continued to work there in various capacities.

Several weeks after the accident, plaintiff began treatment with Dr. Brian Halpern, board certified as a family physician and in sports medicine. At his first visit, plaintiff related a history of having no prior problems with his neck, back or shoulder. He complained of pain in his neck; headaches; radiating pain from

his neck down to his hand with numbness of his left hand; pain in his back that radiated into his leg; and pain in his left shoulder. Dr. Halpern's examination revealed muscle spasm in plaintiff's neck and back, as well as decreased range of motion in his neck, back and left shoulder. A sensory examination showed decreased sensation "in the distribution of one of [plaintiff's] L5 nerve[s] from his back." The doctor's impression was that plaintiff had cervical and lumbosacral strains and left shoulder rotator cuff irritation.

Dr. Halpern ordered MRIs of plaintiff's neck, back, and shoulder, which were performed in April 1997. The cervical MRI disclosed a posterior right central disc herniation at C4–5, and "degenerative disc generation" and a bulging disc at C6–7. The lumbar MRI showed disc desiccation at L4–5, disc bulges at L2–3 and L4–5, and minimal central stenosis at L4–5; this MRI did not reveal any herniations. An MRI of plaintiff's left shoulder disclosed a torn rotator cuff.

On September 11, 1997, plaintiff was in a subsequent motor vehicle accident, a head-on collision. He testified that his car and the other car were going ten miles per hour, and it was "not [a] strong collision." He said his car sustained minor damage.

Plaintiff sought an opinion from Dr. Jack Habermann sometime after the September 1997 accident. According to Dr. Habermann's notes, plaintiff told him that he had been in a car accident, and was rear-ended at a speed of approximately fifty to sixty miles per hour. The record does not indicate to which accident the note was referring.

Dr. Habermann ordered new MRIs for plaintiff's neck, back and left shoulder, which were performed on October 18, 1997. The shoulder MRI showed a tear of the rotator cuff; the cervical MRI showed bulging discs, but the previously-demonstrated herniated disc was no longer present; the lumbar MRI showed a bulging disc at L3–4 and a herniated disc at L4–5, where previously there had been a bulging disc. Both Dr. Halpern and the defense expert, Dr. Douglas Noble, a board certified neuroradiologist,

testified that the herniated disc in plaintiff's low back was not present on the April 1997 MRI, but was first observed on the October 1997 MRI.

Plaintiff was involved in another automobile accident in 1999. He testified that he was in a collision with a police officer, but he did not recall any of the details.

Another MRI of plaintiff's lumbar spine was performed in August 2001. Dr. Noble said the MRI revealed mild degenerative disc disease at L1–2 and L2–3, degenerative disc disease with ridging at L3–4, and degenerative disc disease and osteophytic ridging at L4–5; the doctor attributed the findings to normal age-related wear and tear. He also described a small posterior herniated disc at L4–5, with no evidence of nerve compression.

Plaintiff underwent an L4–5 laminectomy and fusion surgery in February 2003, which he asserts were necessitated by the February 1997 automobile accident. Defendant claims that the surgery was not related to injuries plaintiff sustained in that accident, but that plaintiff's condition was caused by either a normal degenerative process or by plaintiff's September 1997 automobile accident. The operative report listed the surgeon's preoperative diagnoses as: (1) degenerative disc disease; (2) spinal stenosis; (3) disc herniation of L4–5; (4) lumbar instability; and (5) lumbar radiculopathy. Dr. Halpern agreed that the surgery was to repair "all the pathology" in the area of L4–5, including plaintiff's preexisting degenerative disc disease.

Dr. Halpern expressed an opinion that as a result of the February 1997 automobile accident, plaintiff sustained a cervical strain with a herniated disc at C4–5, a bulging disc at C6–7 with radiculitis down his left arm, a torn left rotator cuff, a bulging disc at L2–3, and a herniated disc at L4–5. The doctor proximally related plaintiff's 2003 low back surgery to the L4–5 herniation. He acknowledged, however, that the cervical herniated disc at C4–5, which initially appeared on the April 1997 MRI, had been reabsorbed. He also agreed that the disc desiccation and stenosis

in plaintiff's low back were unrelated to the February 1997 accident.

The defense expert, Dr. Noble, concluded that the herniated disc in plaintiff's low back was unrelated to the February 1997 accident. He implied that it was related to the September 1997 accident, reasoning that the herniated disc at L4–5 was not present on the April 1997 MRI, but instead first appeared on the October 1997 MRI, which was approximately one month after plaintiff's September 1997 automobile accident. Dr. Noble testified that plaintiff herniated his L4–5 disc between the dates the two 1997 MRIs were taken, "due to factors that occurred during that time frame." He also testified that the cervical herniated disc that initially appeared in April 1997 had resolved, having been reabsorbed.

We next turn to the evidence of PIP payments. Two years before trial, on October 7, 2004, plaintiff deposed Susan Wetherell, a First Trenton claims representative responsible for plaintiff's PIP claims. She testified at her deposition as to the process she followed to pay those claims. She agreed that if a medical bill submitted for payment was not causally related to the accident, First Trenton would not pay the bill. She would decide whether to pay medical bills based on her review of doctors' records and reports. She authorized payment of plaintiff's medical bills for his 2003 back surgery based on medical reports she reviewed after the insurance company had doctors examine plaintiff. She testified that before paying plaintiff's medical bills, First Trenton determined that his medical treatment was reasonable, necessary and related to the accident.

Prior to jury selection, plaintiff raised three issues with the court. First, he asked the judge to tell the jury that the insurance company, not the driver of the vehicle who caused the February 1997 accident, was the defendant. Second, he requested that the judge instruct the jury that it could draw an adverse inference against defendant. He argued that the inference was warranted because defense counsel did not intend to call as witnesses the

doctors who had examined plaintiff on behalf of First Trenton for PIP purposes. Those doctors had causally related plaintiff's injuries to the February 1997 accident. Third, plaintiff sought to present Wetherell as a witness, arguing that her testimony was relevant on causation. He claimed that by paying PIP benefits, First Trenton had conceded that plaintiff's injuries, including the herniated disc at L4–5 that required surgery, were proximately caused by the February 1997 accident.

The judge declined to name the insurance company as the defendant. Instead, he instructed the jury that the defendant was the driver of the car, Bologna. The judge also declined to give an adverse inference charge, but he agreed to allow Wetherell to testify. He would not permit her to testify as to the opinions of the doctors whose reports she read, but he would allow her to testify as to her duties, which included reading the reports and deciding whether to pay PIP benefits, and that those benefits were paid.

Following the court's decision to allow Wetherell to testify, defendant agreed with plaintiff to stipulate to what she would say, rather than have her testify. The stipulation read: "Medical bills were all paid by Susan Wetherell, a representative of the defendant after her determination that they were causally related to the February 13th, 1997 motor vehicle accident." Though defense counsel agreed to the stipulation, he moved for a mistrial, claiming that Wetherell's testimony was not relevant. The judge denied the motion, concluding that her testimony was relevant on the issue of whether plaintiff's injuries were causally related to the accident.

The parties recognized that because the jury was not told that First Trenton was the defendant, but rather that the driver of the vehicle was the defendant, the language in the stipulation was ambiguous. The judge found, however, that the "language of the stipulation [was] accurate with regard to facts and [he was] prepared to advise the jury of the stipulation." Thus, the judge told the jurors the following:

I want to advise you, ladies and gentlemen, that the attorneys have agreed to a stipulation. . . .

Here's what the attorneys have agreed to, ladies and gentlemen. "That the medical bills were all paid by Susan Wetherell, a representative of the defendant after her determination that they were causally related to the February 13th, 1997 motor vehicle accident."

Now, ladies and gentlemen, this is what a stipulation is. The parties have agreed to certain facts. The jury should treat these facts as undisputed. That is, that the parties agree that these facts are true. As with all evidence, undisputed facts can be accepted or rejected by you the jury in reaching your verdict.

At the close of plaintiff's case, his attorney moved for a directed verdict on the issue of causality. He argued that because Wetherell, on behalf of First Trenton, determined that the medical bills were causally related to the February 1997 motor vehicle accident, causation was no longer a jury question—plaintiff was entitled to a judgment on causation. The court disagreed. It found that the stipulation simply contained facts that the jury could accept or reject, to be weighed against defendant's evidence of no proximate cause. The judge reasoned that while the facts in the stipulation were undisputed, the jury was free, as with all facts, to accept or reject them.

The meaning of the stipulation arose again at the close of the evidentiary portion of the case. Plaintiff reargued that the stipulation was akin to defendant having stipulated to causation. The judge again rejected that argument, and read to counsel the charge he intended to give to the jury as part of his final instructions: "The stipulation presents facts that the parties agree are true. Therefore, you can accept the stipulation as true in your deliberations."

In their closings, both counsel forcefully addressed the stipulation. Defense counsel stated the following:

[T]he case does not include anything about medical bills or lost wages. That's not part of this case. On that issue you were read a stipulation earlier about some woman named Susan Wetherell. You were read a stipulation that somebody named Susan Wetherell paid the plaintiff's bills. That doesn't, the defendant and myself, we don't know who she is or why she paid the bills. The defendant was not a part of that process. So the fact that somebody paid his medical bills has nothing to do with the defense, the defendant, myself and Dr. Noble are putting on. The bills were paid. We stipulated that somebody named Susan paid the bills. It just

means it's not a part of this case. That's all. We agreed that she paid the bills. She did. It's a stipulation.

Again, my client, the defendant, doesn't know Susan Wetherell or anybody else or anything associated with the payment of bills.

In his closing, plaintiff's counsel rebutted the argument that defense counsel did not know who Wetherell was. In doing so, he attempted to refer to her deposition, where she was represented by a member of defense counsel's law firm. Defense counsel objected and the court sustained the objection because the deposition was not in evidence. Plaintiff's counsel then made the following argument to the jury:

In my opening I said to you, . . . now it just so happens in this particular case that the medical care for [plaintiff] was managed by the defendant's representatives. . . . Mr. Bologna caused the accident and was responsible for the accident.

But it also just so happened that his representatives were responsible to manage [plaintiff's] care and to approve or disapprove of the medical care and to pay the bills. And every time [plaintiff] needed to go to this doctor or have this procedure done or have surgery done, he had to get approval from the defendant's representatives and he did. And the defendant's representatives felt that the injuries that [plaintiff] sustained, his injuries, were causally connected and related to the motor vehicle accident . . . and therefore should be paid by the defendant's representatives. That's what I said to you.

[Defense counsel] said this to you. He said now I will tell you that the testimony you hear from the representative, because ladies and gentlemen, at that time the representative, Susan Wetherell, was going to testify. Let me start again. Now, I will tell you that the testimony you hear from the representative, she will tell you that Mr. Bologna's representatives had nothing to do with the medical care and treatment. That's what she's going to tell you. That's what [defense counsel] said.

Prior to calling Susan Wetherell to testify, there was a stipulation and the Judge is going to tell you what a stipulation is and who it binds. A stipulation . . . binds the parties to the lawsuit. And this stipulation was made by [defense counsel] and therefore I did not call Susan Wetherell to go through what I said she would say if she had testified. . . .

[A]ll of the [medical] bills [defendant's] representatives conceded were causally related to the accident. That's the stipulation.

In his final charge to the jury, the judge addressed the stipulation as follows:

Here is what the parties agreed to. "It is hereby stipulated by the parties that the medical bills were all paid by Susan Wetherell, a representative of the defendant, after her determination that they were causally related to the February 13th, 1997 motor vehicle accident."

Now, ladies and gentlemen, I know I told you what a stipulation is during the course of the trial but as I said, I want to tell you what it is now and I want you to pay close attention to this definition. "The stipulation presents facts that the parties agree are true. Therefore, you can accept the stipulation as true in your deliberations." I'll repeat that one more time ladies and gentlemen. "The stipulation presents facts that the parties agree are true. Therefore, you can accept the stipulation as true in your deliberations."

The jury returned a unanimous verdict that plaintiff's injuries were not proximately caused by the February 1997 accident. Following the verdict, plaintiff moved for a judgment notwithstanding the verdict and for a new trial. The judge denied plaintiff's motions, finding that reasonable minds could differ on the issue of causation; and that the verdict was not a miscarriage of justice in light of the expert opinion of Dr. Noble, who related the herniated disc to factors other than the February 13, 1997 accident.

Against this factual and procedural background, we begin our discussion with plaintiff's challenge to the judge's decision not to inform the jury that the defendant was plaintiff's insurance carrier. Whether a jury in a UIM action should be informed that the defendant is the plaintiff's insurance carrier always presents a troublesome issue. Our evidence rules provide that evidence of whether a person is insured against liability is inadmissible on the issue of that person's negligence or other wrongful conduct. *N.J.R.E.* 411. The rule does not, however, require the exclusion of evidence of insurance against liability when offered for other purposes. *Ibid.* Nor does the evidentiary preclusion automatically apply where the insurance carrier is a party. Biunno, *Current N.J. Rules of Evidence,* comment on *N.J.R.E.* 411 (2007).

In an uninsured or underinsured motorist claim, the insurance company is a contractual substitute for the tortfeasor. *Midland Ins. Co. v. Colatrella,* 102 *N.J.* 612, 617, 510 *A.2d* 30 (1986) ("[A]n uninsured motorist provision is a contractual substitute for a tort action against an uninsured motorist."). Although in such a case the jury is typically told that the tortfeasor is the defendant, no blanket rule bars reference to the insurance carrier

as a party. *Krohn v. N.J. Full Ins. Underwriters Ass'n,* 316 *N.J.Super.* 477, 482, 720 *A.*2d 640 (App.Div.1998), *certif. denied,* 158 *N.J.* 74, 726 *A.*2d 937 (1999); *see also Wenz v. Allstate Ins. Co.,* 316 *N.J.Super.* 570, 575, 579–80, 720 *A.*2d 989 (App.Div.1998). If the jury is informed that the plaintiff has instituted a lawsuit against its own insurance carrier, however, the jury must also be instructed that the fact that the insurance company is a party "has no relevancy on the issue of damages and that the value of those damages must be measured by the evidence of those damages presented during the trial, unaffected by the fact that plaintiff seeks recovery from his insurer." *Wenz, supra,* 316 *N.J.Super.* at 580, 720 *A.*2d 989.

■ Here, the judge decided not to tell the jury that the defendant was an insurance company. Though we perceive that under the circumstances it would have been better to tell the jury, subject to an appropriate instruction, that the carrier was the defendant, the court's decision not to do so was not an abuse of discretion.[3]

Nonetheless, the failure to tell the jury that the carrier was the defendant led to further complications in light of the stipulation. Because the jury believed that the defendant was the tortfeasor, telling the jury that Wetherell was "a representative of the defendant" was not accurate.

■ In his closing, defense counsel added to the confusion. He claimed that neither he nor his client knew who Wetherell was.

---

[3] We question the general wisdom of not telling the jury the truth about who the defendant is. Judges routinely instruct jurors to disregard testimony improperly admitted or other inappropriate behavior that occurs during a trial, and we assume that the jury follows the instruction. *See State v. Burns,* 192 *N.J.* 312, 335, 929 *A.*2d 1041 (2007) (when commenting on a jury instruction to disregard the conduct of a witness who refused to testify, the Court observed that "[o]ne of the foundations of our jury system is that the jury is presumed to follow the court's instructions"). We perceive no difference between those circumstances and telling the jury that the insurance carrier is the defendant, while providing a specific instruction similar to that in *Wenz, supra,* 316 *N.J.Super.* at 580, 720 *A.*2d 989.

Plaintiff claims these remarks were untrue, unduly prejudicial, and warrant a new trial. Defense counsel has responded that his statement was accurate because as far as the jury was concerned, Bologna, the tortfeasor, was the defendant, and no dispute exists that he did not know Wetherell. Though we question the correctness of defense counsel's statements, especially in light of his law firm's representation of Wetherell at her deposition, because we conclude that the stipulation was not admissible in the first instance, defense counsel's comments were not clearly capable of producing an unjust result. *R.* 2:10–2. We reach our conclusion for the following reasons.

Although the insurer is a first-party defendant based on the insurance contract, UIM cases are tried as if they are third-party tort actions. *Krohn, supra,* 316 *N.J.Super.* at 483, 720 *A.*2d 640. "The insured's legal entitlement to damages for the uninsured or underinsured driver's negligence 'imports into the [uninsured or underinsured motorist's] policy all of the normal rules governing tort liability and damages.' " *Ibid.* (quoting *Montedoro v. City of Asbury Park,* 174 *N.J.Super.* 305, 308–09, 416 *A.*2d 433 (App.Div.1980)). We have observed that an

> insured victim's recovery is, to a greater or lesser extent, a substitute for that which would have been derived from a third-party suit but for the inadequacy of the tortfeasor's insurance. The only difference is that ... [i]n the case of underinsurance, the carrier is obligated to pay its insured up to the coverage limit less the tortfeasor's coverage limit. Everything else is the same, including the necessity of finding fault on the part of the uninsured or underinsured driver. [*Stabile v. N.J. Mfrs. Ins. Co.,* 263 *N.J.Super.* 434, 441, 623 *A.*2d 252 (App.Div.1993) (internal citation omitted)].

"In effect, an [underinsured] motorist provision is a contractual substitute for a tort action against an [underinsured] motorist." *Midland Ins. Co., supra,* 102 *N.J.* at 617, 510 *A.*2d 30.

Thus, here, plaintiff's UIM claim rested on substantially the same evidence as if he had tried the case against the tortfeasor. Just as defendant's decision to pay PIP benefits would not have been admissible in that trial, *see Roig, supra,* 135 *N.J.* at 513, 641 *A.*2d 248, it was similarly inadmissible in the UIM trial. The insurance carrier's decision to pay PIP benefits, for whatever

reason, is not logically connected to the plaintiff's cause of action. It does not have "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401.

Also rendering the stipulation inadmissible is that Wetherell was not competent to testify as to whether plaintiff's injuries were caused by the February 1997 automobile accident. Her decision to pay PIP benefits was based on her interpretation of doctors' reports. Permitting her to testify that PIP benefits were paid because the injuries were proximately caused by the accident, which was the practical effect of the stipulation, would have allowed the jury to hear a medical opinion of a lay witness, formed from reports of experts who were not witnesses at trial. *See Kelly v. Borwegen,* 95 *N.J.Super.* 240, 243–44, 230 *A.2d* 532 (App.Div.1967) (medical causation generally requires expert testimony). Though plaintiff could have called the doctors who examined him in conjunction with his PIP applications as witnesses, he did not do so.

We are mindful that if a PIP claim proceeds to arbitration, under collateral estoppel principles, the arbitrator's findings on proximate cause may be binding in both a subsequent UIM action, *Habick v. Liberty Mut. Fire Ins. Co.,* 320 *N.J.Super.* 244, 262, 727 *A.2d* 51 (App.Div.), *certif. denied,* 161 *N.J.* 149, 735 *A.2d* 574 (1999), and in a subsequent third-party action against the tortfeasor. *Kozlowski v. Smith,* 193 *N.J.Super.* 672, 674–75, 475 *A.2d* 663 (App.Div.1984). In those situations, however, the arbitrator decides the proximate cause issue on proper medical proofs. *Habick, supra,* 320 *N.J.Super.* at 246–47, 727 *A.2d* 51; *Kozlowski, supra,* 193 *N.J.Super.* at 675, 475 *A.2d* 663. Here there was no PIP arbitration. Collateral estoppel is inapplicable in that the issue had not actually been litigated in a prior proceeding. *See Fama v. Yi,* 359 *N.J.Super.* 353, 359–60, 820 *A.2d* 65 (App.Div.) (finding jury verdict collaterally estops PIP claim on issue of causation when issue decided in prior action is identical to issue

presented in subsequent action and issue was actually litigated), *certif. denied,* 178 *N.J.* 29, 834 *A.*2d 403 (2003).

There exists another significant reason to preclude evidence of the payment of PIP benefits in a subsequent UIM action on the issue of causation. Permitting that evidence may interfere with the prompt payment of those benefits.

 PIP benefits, authorized by *N.J.S.A.* 39:6A–9.1, include "payment of medical expenses, without regard to fault, for the named insured and resident members of his or her family, others occupying a vehicle of the named insured, or pedestrians injured in an automobile accident." *Palisades Safety & Ins. Ass'n v. Bastien,* 175 *N.J.* 144, 148, 814 *A.*2d 619 (2003). The statute is remedial legislation, and is given liberal construction to provide victims with the "'broadest possible coverage.'" *Ibid.* (quoting *Svenson v. Nat'l Consumer Ins. Co.,* 322 *N.J.Super.* 410, 416, 731 *A.*2d 91 (App.Div.1999)). As Judge Pressler explained in *Washington v. Market Transition Facility,* 295 *N.J.Super.* 368, 372, 685 *A.*2d 57 (App.Div.1996), the legislative policy in enacting no fault legislation was the "assurance of prompt and complete medical-expense payment to persons injured in automobile accidents."

Payment of PIP benefits often involves small amounts. Binding an insurer in a subsequent UIM action to its causation determination in deciding whether to pay PIP benefits would inevitably complicate an insurer's decision to pay those benefits. An insurer may think twice about paying even relatively small PIP claims if it anticipates a potential UIM claim in the future, which at the very least could delay the payment of benefits, frustrating the public policy of expeditious payment of medical expenses. Thus, unless a PIP determination has been previously litigated, evidence of the insurance company's decision to pay PIP benefits is inadmissible in a subsequent UIM proceeding.

Accordingly, we conclude that the evidence that defendant paid plaintiff's medical bills, as is reflected in the stipulation, was inadmissible. Though plaintiff claims defense counsel distorted

the facts of the stipulation in his summation, warranting a new trial, *see Bender v. Adelson*, 187 *N.J.* 411, 431, 901 *A.*2d 907 (2006) (summations must be based in truth, and counsel may not misstate evidence or distort facts), in light of the inadmissibility of the stipulation, counsel's remarks are not a basis for reversal of the jury verdict.

Next, we address the post-trial motions. We agree with the trial judge that the evidence supported the jury's determination that plaintiff's injuries were not proximately caused by the February 1997 accident. *Budd v. Erie Lackawanna R.R. Co.*, 98 *N.J.Super.* 47, 57–58, 236 *A.*2d 143 (App.Div.1967), *certif. denied*, 51 *N.J.* 186, 238 *A.*2d 472 (1968). Briefly stated, though Dr. Halpern related the herniated disc at L4–5 to the February 1997 accident, Dr. Noble did not. The April 1997 MRI showed no herniation at L4–5. It was not until after the September 1997 automobile accident, in which plaintiff was involved in a head-on collision, that an MRI, performed in October 1997, disclosed the herniated lumbar disc. The jury may well have concluded that, based on Dr. Noble's testimony, plaintiff's herniated disc was not caused by the February 1997 accident, but by the September 1997 accident instead. The jury apparently placed more weight on defendant's expert's testimony than on that of plaintiff's expert.

Plaintiff did not have low back surgery until 2003. Given his history, which included an automobile accident in 1991, two in 1997, and one in 1999, as well as his degenerative disc disease that both experts agreed was not related to the February 1997 automobile accident, the evidence was more than sufficient for the jury to conclude that plaintiff's injuries, particularly the herniated disc at L4–5 that required surgery in 2003, were not proximately caused by the February 1997 automobile accident.

It is also notable that while plaintiff suffered a herniated cervical disc in the February 1997 accident, his own doctor, Dr. Halpern, agreed that the herniation had been reabsorbed and no longer existed by the time of the 2001 MRI. Furthermore, as to plaintiff's left shoulder injury, though plaintiff denied prior shoul-

der problems, he conceded on cross-examination that he "probably had occasional problems" with his shoulder before the February 1997 accident. He also testified that he did not strike his shoulder in the accident. Put simply, the evidence supported the verdict.

Affirmed.