JUSTICE LaVECCHIA delivered the opinion of the Court.
**273 In this consolidated appeal, we consider one question of law: Did the Legislature intend to deviate from its highly regulated no-fault system of first-party self-insurance to cover medical expenses arising from automobile accidents when it amended the statutory scheme to allow an insured to elect smaller amounts of personal injury protection (PIP) under a standard policy?
**274 Each plaintiff in this appeal was injured in a car accident. Each was insured under a standard policy with insurance that provided for $ 15,000 in PIP coverage instead of the default amount of $ 250,000. Neither plaintiff was able to sustain a claim for bodily injury (noneconomic loss) due to each policy's limitation-on-lawsuit option. Each was suing for outstanding medical provider charges in excess of their elected PIP coverage ($ 28,000 and $ 10,000, respectively). The trial court record reveals that the outstanding provider charges had not been subjected to the cost *265 containment requirements under the PIP regulatory scheme.
The Appellate Division concluded that plaintiffs could introduce evidence of their outstanding medical bills in excess of the elected PIP policy coverage in support of fault-based claims for economic damages against their respective tortfeasors.
For the reasons that follow, we reverse. We cannot conclude that there is evidence of a clear intention on the part of the Legislature to deviate from the carefully constructed no-fault first-party PIP system of regulated coverage of contained medical expenses and return to fault-based suits consisting solely of economic damages claims for medical expenses in excess of an elected lesser amount of available PIP coverage. Unless the Legislature makes such an intent clearly known, we will not assume that such a change was intended by the Legislature through its amendments to the no-fault system in the Automobile Insurance Cost Reduction Act (AICRA).
Indeed, in the opening findings and declarations section of AICRA, it was the Legislature's belief that "it is good public policy to provide medical benefits on a first party basis, without regard to fault, to persons injured in automobile accidents," but "in order to keep premium costs down, the cost of the benefit must be offset by a reduction in the cost of other coverages, most notably a restriction on the right of persons who have non-permanent or non-serious injuries to sue for pain and suffering." N.J.S.A. 39:6A-1.1(b) (1998). Upon consideration of the coordinated amendments accomplished through AICRA to tighten up medical **275 utilization, contain insurance costs, and make first-party no-fault insurance coverage more affordable and available, we find the Appellate Division's conclusion counter-intuitive and look for greater guidance from the Legislative Branch.
I.
On October 19, 2011, plaintiff Joshua Haines was in an automobile accident. While driving his father's car, he was struck by a car driven by defendant Jacob W. Taft.[1] Not having any health insurance, Haines sought coverage for medical treatment for his injuries under the PIP plan in his father's standard automobile insurance policy. The PIP plan provided for $ 15,000 of coverage -- the minimum amount permitted under N.J.S.A. 39:6A-4.3(e). Haines exhausted the PIP coverage. He claims to have approximately $ 28,000 in outstanding medical claims that providers are seeking from him. The record before the motion court reveals that Haines' counsel represented that the majority of the $ 28,000 in costs were not subjected to applicable PIP fee schedules but rather are based on the full amount billed by the providers.
On September 13, 2016, the motor vehicle driven by plaintiff Tuwona Little was rear-ended by defendant Jayne Nishimura's vehicle. Little also was insured under a standard insurance policy that provided $ 15,000 in PIP coverage. She sought treatment for the personal injuries she sustained in the accident. Like Haines, Little eventually exhausted her PIP coverage. She claims that she has $ 10,488 in unpaid medical expenses. Similar to the record in Haines, the record considered by the motion court indicated that the individual medical expenses had not been subjected to any detailed review to determine if *266 they were "reasonable and necessary," and the court did not deem it essential to resolve that factual matter before proceeding with the legal question before it. **276 Each plaintiff filed a personal injury claim against the respective defendant-driver and requested a jury trial. Each defendant filed a pre-trial motion to preclude plaintiff from presenting evidence of medical expenses that exceeded the $ 15,000 PIP limits. Defendants relied on N.J.S.A. 39:6A-12 (Section 12), which addresses the inadmissibility of evidence of losses collectible under personal injury protection, and Roig v. Kelsey, 135 N.J. 500, 641 A.2d 248 (1994). In Roig, our Court reasoned that the public policies underlying the no-fault system required that we construe Section 12 to prohibit injured parties from recovering medical deductibles and copayments from a tortfeasor. 135 N.J. at 513, 515, 641 A.2d 248.
In opposition to the motion, Haines maintained that medical bills exceeding PIP coverage constitute "economic loss" as that term presently is defined in N.J.S.A. 39:6A-2(k) and that evidence of such medical bills should thus be admissible at trial. Similarly, Little distinguished the present case, stating that, in amending the definition of economic loss to include a reference to "medical expenses" after the Roig decision, the Legislature "clearly evinced its intention to allow recovery [in tort] for medical expenses."
The trial courts ruled against plaintiffs in each matter and prohibited plaintiffs from admitting evidence of their medical expenses that exceeded their $ 15,000 PIP limits. In Little's case, the trial court reasoned that "under the AICRA, the Legislature did not intend to have ancillary litigation or to have litigation over medical bills not covered by the PIP limits that [Little] selected." In Haines's case, the trial court reasoned that a person who chooses a $ 15,000 PIP plan should not be allowed to recover in excess of that amount because he or she has made an affirmative decision to buy less insurance for less money. The court concluded that the purpose of the no-fault system is to keep premiums lower by allowing insureds to buy smaller policies, and a necessary component of that goal, as discussed in Roig, is eliminating litigation over claims for medical expenses exceeding an insured's PIP limit.
**277 The Appellate Division consolidated the cases on appeal, and, in a published opinion, reversed both trial court orders. Haines v. Taft, 450 N.J. Super. 295, 309-10, 162 A.3d 296 (App. Div. 2017).
The panel found persuasive plaintiffs' argument in favor of a plain-language approach to N.J.S.A. 39:6A-12 and also agreed that allowing recovery of uncompensated medical expenses is not contrary to the statute's principal goal of avoiding double recovery of medical expenses by plaintiffs. Id. at 302, 307, 162 A.3d 296.
Examining N.J.S.A. 39:6A-12 and the statutory provisions referred to therein, the Appellate Division concluded that "amounts collectible or paid under a standard automobile insurance policy" did not "refer[ ] solely to the maximum PIP coverage, or $ 250,000, that is potentially available in a standard policy." Id. at 302, 162 A.3d 296. The panel reasoned that "because the statutory language expressly allows varying levels of PIP benefits paid or collectible under a standard policy," ibid. (citing N.J.S.A. 39:6A-4.3(e) ), Haines and Little were barred from admitting evidence of medical expenses up to their $ 15,000 PIP policy limit. The panel concluded, however, that evidence of their medical expenses between$ 15,000 and $ 250,000 was not barred by Section 12 and therefore was "admissible and recoverable *267 against the tortfeasors." Id. at 303, 162 A.3d 296.
The panel declined to accept defendants' position that the policies underlying AICRA necessitated the exclusion of recovery for medical expenses between $ 15,000 and $ 250,000. Id. at 306-07, 162 A.3d 296. Similarly, the panel was unpersuaded that allowing admission of medical expenses above an insured's PIP policy limit, but below the $ 250,000 PIP limit, would insert a fault-based aspect into a no-fault system even though a plaintiff would have to first prove that the defendant was at fault for their injuries before he or she would be entitled to recovery. Ibid.
The panel did not find that our Court's earlier decision in Roig precluded its result because, in the panel's view, Roig did not "bar an injured insured from recovering any medical bills in excess of an insured's PIP limits." Id. at 305, 162 A.3d 296. In reaching that **278 conclusion, the panel noted that it was "significant" that "Section 12 remained intact even after the Legislature expanded the definition of 'economic loss' in 1998 to include uncompensated medical expenses." Id. at 306, 162 A.3d 296 ; see also id. at 308-09, 162 A.3d 296. And the panel highlighted that, in Roig, the Court recognized a legislative intent "to bar the recovery of minor expenses." Id. at 306-07, 162 A.3d 296. In a footnote, the panel observed that although the Roig decision never defined a "minor" medical expense, the Roig Court did highlight a quotation from Governor Cahill's First Annual Message, which noted that "minor automobile negligence case[s]" are those that "result[ ] in a judgment of settlement under $ 3000." Id. at 306, 162 A.3d 296 n.5 (quoting Roig, 135 N.J at 510, 641 A.2d 248 ).
Ultimately, the panel reasoned that "copayments and deductibles are insufficiently analogous to the kind of expenses at issue here," referring to Haines and Little's outstanding medical expenses as "hardly minor." Id. at 307, 162 A.3d 296. Quoting an earlier published trial court decision, the panel noted that, unlike copayments and deductibles, the severity of an accident victim's injuries and the resultant medical expenses cannot be anticipated and "AICRA is devoid of any legislative intent to have insureds bargain for potentially bankrupting medical bills, in exchange for lower premiums." Ibid. (quoting Wise v. Marienski, 425 N.J. Super. 110, 124-25, 39 A.3d 947 (Law Div. 2011) ).
Ultimately, the panel crafted an exception to its interpretation and application of N.J.S.A. 39:6A-12 by noting that there may be instances in which medical expenses at issue may minimally exceed a plaintiff's PIP policy limits and that arguably under those circumstances they might be considered minor and, thus, unrecoverable. Id. at 310, 162 A.3d 296. The panel ultimately left the issue of what constitutes minor expenses unanswered, but made clear its view that Haines' and Little's unpaid medical bills were not minor. Ibid.
We granted defendants' petitions for certification. 231 N.J. 179, 173 A.3d 598 (2017) ; 231 N.J. 155, 172 A.3d 1090 (2017). We also **279 granted amicus curiae status to the New Jersey Association for Justice (NJAJ). The Insurance Council of New Jersey (ICNJ), the Property Casualty Insurers Association of America (PCI), and the New Jersey Defense Association (NJDA), who participated before the Appellate Division, also served as amici before this Court. Our analysis of this matter incorporates their arguments, along with those of the parties.
II.
Plaintiffs, as well as their supporting amici, focus on certain language in *268 N.J.S.A. 39:6A-12. That statute provides in full:
Except as may be required in an action brought pursuant to section 20 of L. 1983, c. 362 ( [N.J.S.A.] 39:6A-9.1 ), evidence of the amounts collectible or paid under a standard automobile insurance policy pursuant to sections 4 and 10 of L. 1972, c. 70 ( [N.J.S.A.] 39:6A-4 and 39:6A-10 ), amounts collectible or paid for medical expense benefits under a basic automobile insurance policy pursuant to section 4 of L. 1998, c. 21 ( [N.J.S.A.] 39:6A-3.1 ) and amounts collectible or paid for benefits under a special automobile insurance policy pursuant to section 45 of L. 2003, c. 89 ( [N.J.S.A.] 39:6A-3.3 ), to an injured person, including the amounts of any deductibles, copayments or exclusions, including exclusions pursuant to subsection d. of section 13 of L. 1983, c. 362 ( [ N.J.S.A. 39:6A-4.3 ), otherwise compensated is inadmissible in a civil action for recovery of damages for bodily injury by such injured person.
The court shall instruct the jury that, in arriving at a verdict as to the amount of the damages for noneconomic loss to be recovered by the injured person, the jury shall not speculate as to the amount of the medical expense benefits paid or payable by an automobile insurer under personal injury protection coverage payable under a standard automobile insurance policy pursuant to sections 4 and 10 of L. 1972, c. 70 ( [N.J.S.A.] 39:6A-4 and 39:6A-10 ), medical expense benefits under a basic automobile insurance policy pursuant to section 4 of L. 1998, c. 21 ( [N.J.S.A.] 39:6A-3.1 ) or benefits under a special automobile insurance policy pursuant to section 45 of L. 2003, c. 89 ( [N.J.S.A.] 39:6A-3.3 ) to the injured person, nor shall they speculate as to the amount of benefits paid or payable by a health insurer, health maintenance organization or governmental agency under subsection d. of section 13 of L. 1983, c. 362 ( [N.J.S.A.] 39:6A-4.3 ).
Nothing in this section shall be construed to limit the right of recovery, against the tortfeasor, of uncompensated economic loss sustained by the injured party.
[ N.J.S.A. 39:6A-12 (emphases added).]
Reading that statute's closing language in concert with the present definition of "economic loss" in N.J.S.A. 39:6A-2(k) ("uncompensated loss of income or property, or other uncompensated **280 expenses, including, but not limited to, medical expenses"), those advocates claim, in essence, that there is no need to go beyond a plain-language analysis of Section 12. See DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005) ("A court should not 'resort to extrinsic interpretative aids' when 'the statutory language is clear and unambiguous, and susceptible to only one interpretation.' " (quoting Lozano v. Frank DeLuca Const., 178 N.J. 513, 522, 842 A.2d 156 (2004) ) ). That approach, they assert, controls the statutory construction issue here and compels the conclusion reached by the appellate panel.
Although plaintiffs' argument is no doubt a plausible interpretation, we cannot agree that the language of this provision is as clear as is contended. An inherent tension appears to exist between Section 12 and its final reference to uncompensated economic loss.
At the outset, one must recognize that Section 12 addresses evidence that is admissible or not in a claim for bodily injury. The first paragraph sets that stage for the section. And, as is universally understood, authorization to bring claims for bodily injury under our regulated system of motor vehicle insurance law is heavily circumscribed. Indeed, in this matter, both plaintiffs had the limitation-on-lawsuit option *269 controlling their ability to bring a claim for bodily injury and neither could exceed the necessary threshold. So, we are considering this issue in the context of a stand-alone claim to be able to sue for only uncompensated medical expenses in a case where the limitation-on-lawsuit policy option prevented a claim for bodily injury.[2]
Even though there is no bodily injury claim here, plaintiffs advance their plain-language argument notwithstanding the following structure to the substance of Section 12. Section 12's opening paragraph limits the admissibility of "collectible or paid"
**281 PIP or medical expense evidence in civil claims for recovery of bodily injury by injured persons. The section's second paragraph commands the trial court to instruct the jury against speculating about the amounts paid or payable by an insurer for PIP or medical expense benefits when calculating noneconomic loss for a bodily injury claim. Despite the provision's narrow focus on evidentiary matters in trials for noneconomic losses, plaintiffs construe the third paragraph's language to give rise to a stand-alone right to pursue a third-party liability claim against a tortfeasor exclusively for uncompensated economic loss of medical benefits not covered due to having a lesser amount of PIP coverage.
We cannot agree that there is an unambiguous "plain-language" reading to be gleaned from Section 12 that, even with the related definition of economic loss,[3] supports plaintiffs' preferred interpretation. Section 12 does not unmistakably compel plaintiffs' interpretation. Nor is the reasoning so overwhelmingly persuasive that a reviewing court must be precluded from any examination of the overall legislative scheme, its history, purpose, and intent when assessing the merit of the conclusion that plaintiffs assert. DiProspero, 183 N.J. at 492-93, 874 A.2d 1039 ("[I]f there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence ...."). Indeed, one can envision an equally plausible construction, from the intertwined thrust and sense of this section overall and its three component paragraphs, that such uncompensated economic losses may be recovered from the tortfeasor within the context of a viable suit for bodily injury.
Defendants and their supporting amici make powerful arguments that the interpretative question posed by plaintiffs' claims in these matters requires consideration of whether it is at odds with the overall intent of the legislative scheme for no-fault **282 insurance. Indeed, as amici ICNJ and PCI dramatically asserted in their briefing filed in this appeal, the Appellate Division "decision blows open the black hole of automobile tort litigation New Jersey's Legislature so carefully sought to close over the past four decades." It is asserted that the panel's interpretation of N.J.S.A. 39A:6A-12 will lead to a new statutory scheme at odds with the policies underlying the no-fault system because it relieves insureds of the intended consequence of minimizing coverage in exchange for less money and thereby creates a fault-based system. That fault-based system will require "full-blown trial[s] with expert medical testimony" where plaintiffs *270 will bear the burden of establishing defendant liability and will have to show that their medical treatment and expenses were reasonable and necessary. ICNJ and PCI further argue that the Appellate Division's decision not only will increase the overall volume of litigation but will also "creat[e] an additional level of complexity by requiring a case-by-case, subjective analysis of what constitutes 'minor' uncompensated medical expenses in each case."
Defendants and related amici argue that the statute prohibits admission of "amounts collectible or paid" under a standard, basic, or special automobile insurance policy. But, they maintain, nowhere in the statute is the term "collectible," as it is used in that phrase, defined. Indeed, defendants and related amici contend that the "amounts collectible" refers to $ 250,000 rather than the insured's policy limit because $ 250,000 is the amount of PIP coverage available to every consumer; plaintiffs, on the other hand, contend that "amounts collectible" refers to the insured's policy limit because that is the amount that the insured consumer may collect.
In light of the latent tension and ambiguity within Section 12 and, further, due to the consequences that would flow from interpreting that section in line with plaintiffs' construction and as the appellate panel did, we would be remiss not to examine the question before us in light of the historical development of New Jersey's no-fault law. Our search is for legislative intent.
**283 Frugis v. Bracigliano, 177 N.J. 250, 280, 827 A.2d 1040 (2003) ("[W]hen interpreting a statute, our overriding goal must be to determine the Legislature's intent." (quoting Cornblatt, P.A. v. Barow, 153 N.J. 218, 231, 708 A.2d 401 (1998) ) ). In this matter, we find it necessary to examine all the aids we can muster in our effort to discern that intent and give it effect.
III.
A.
As our Court noted in Roig v. Kelsey, legislative intent controls because "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as consonant to reason and good discretion." 135 N.J. at 515, 641 A.2d 248 (quoting State v. State Troopers Fraternal Ass'n, 134 N.J. 393, 418, 634 A.2d 478 (1993) (internal quotation marks omitted) ). When "discerning that [legislative] intent we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part." Ibid. (alteration in original) (quoting Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129, 527 A.2d 1368 (1987) ).
This Court's last opportunity to discuss the limits of medical expense recovery under New Jersey's no-fault insurance system occurred in Roig, and, there, we determined that a plaintiff could not recover out-of-pocket costs for PIP deductibles and co-payments in a negligence suit. Id. at 501, 641 A.2d 248. In coming to that conclusion, the Court recognized that the history of the no-fault statute was a series of "trade-off[s]." Id. at 502-07, 641 A.2d 248. At its inception, drivers received "payment of medical expenses, regardless of fault," in exchange "for 'either a limitation on or the elimination of conventional tort-based personal-injury lawsuits.' " Id. at 503, 641 A.2d 248 (quoting Oswin v. Shaw, 129 N.J. 290, 295, 609 A.2d 415 (1992) ). Subsequently, the Legislature introduced the option for PIP deductibles -- another trade-off "reduc[ing] the cost of automobile insurance by shifting some of **284 the rising medical-expense costs to alternative forms of health insurance." Id. at 504-05, 641 A.2d 248. In that same amendment, the Legislature added a "Tort Limitation Option" *271 where "[o]nce again, motorists were presented with another trade-off option: lower premiums in exchange for increased tort thresholds." Id. at 505, 641 A.2d 248.
The entire history of no-fault insurance is one of changing priorities, shifting from full coverage to cost containment. We find that those priorities inform our consideration of the statutory scheme as it exists today, and we therefore summarize the law's historical evolution.
B.
The no-fault system was first enacted as part of the New Jersey Automobile Reparation Reform Act ("No-Fault Law"). L. 1972, c. 70. The recommendation to adopt a no-fault system came from the Automobile Insurance Study Commission, and was received favorably by Governor William Cahill. Governor William T. Cahill, Second Annual Message 55 (Jan. 11, 1972). He believed that the proposed system would "result in the motoring public's securing protection at a lesser cost, expediting the relief of the accident victim ... and yet preserv[e] that victim's right to full and adequate compensation." Ibid. Additionally, he believed a no-fault system would bring about a "reduction in insurance premiums" and a "reduction of the present court backlog." Id. at 56.
Effective as of 1973, the No-Fault Law required insurance companies to provide insureds unlimited medical expense benefits without regard to fault. N.J.S.A. 39:6A-4 (1973). As a trade-off, the law limited the right to sue for pain and suffering, requiring parties to have over $ 200 in medical expenses before they would have standing for a negligence suit. N.J.S.A. 39:6A-8 (1973). The legislation was openly intended to provide "prompt compensation for all [of a driver's] economic losses," and to "ease the burden placed upon [New Jersey] courts by the present system." Governor's Signing Statement to A. 667 (L. 1972, c. 70). Subsequent **285 measures addressed a perceived need to consider financial practicalities. At first, cost-shifting was the solution of choice.
In 1977, the Legislature amended the No-Fault Law to limit insurers' exposure for PIP claims. L. 1977, c. 310. Insurers were still responsible for providing benefits for the first $ 75,000 of a claim, but reimbursements above $ 75,000 were shifted to the Unsatisfied Claim and Judgment Fund (UCJF). N.J.S.A. 39:6A-4(a) (1977).
The impetus for that amendment came from the consequences of the No-Fault Law's escalation of insurance premiums. To cover catastrophic injury claims, small- to mid-sized insurance companies were forced to buy reinsurance policies that were "not State regulated" and extremely costly -- an expense that trickled down to the consumer. Governor's Signing Message to S. 1380 (L. 1977, c. 310). The amendment was meant to strike a balance under which "accident victims w[ould] continue to receive full compensation for medical expenses and at the same time relieve[d] insurance companies of the financial burdens of unlimited medical expense coverage under the present law." See Senate Judiciary Comm. Statement to S. 1380 1 (L. 1977, c. 310).
Despite that change, increases in the cost of insurance premiums did not subside. In an effort to "bring about long sought after reductions in premiums for New Jersey motorists," the Legislature passed the New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984. Governor's Signing Statement to A. 3981 (L. 1983, c. 362). That amendment to the No-Fault Law offered a series of policy options to consumers, who could decrease their insurance *272 coverage in exchange for a lower insurance premium. See N.J.S.A. 39:6A-4 (1984).
The choices included allowing motorists to select policies with deductibles, N.J.S.A. 39:6A-4.3(a) (1984), and to forego coverage for lost wages, essential services, and funeral expenses, N.J.S.A. 39:6A-4.3(b) (1984), as well as a provision for limitations on lawsuits for noneconomic loss, N.J.S.A. 39:6A-8 (1984). The Legislature acknowledged that in some instances the foregone coverage **286 would be replaced by another form of insurance, leaving the motorist fully covered. See, e.g., Sponsor's Statement to A. 3981 1 (L. 1983, c. 362) (noting that selecting PIP insurance with a deductible "permit[s] an insured to coordinate his automobile insurance coverage with other forms of health coverage"). However, the 1983 amendment did not require that a motorist have alternative insurance to make up for the waived benefits, marking the beginning of the Legislature's shift from a paramount priority of full coverage to one of cost containment.
The high prioritization of cost containment continued with the 1988 amendments to the No-Fault Law. L. 1988, c. 119. The amendments were described as intended to rectify a system that was "grossly out of balance." Governor's Veto Statement to S. 2637 (3d Reprint) (Aug. 4, 1988). While the no-fault system was based on an "implicit promise" of "prompt payment of medical bills without regard for fault in exchange for a significant limitation on frivolous lawsuits for non-economic damages, such as pain and suffering," the then-existing $ 200 threshold for suits was too low to act as a sufficient curb. Ibid.
The amendments increased thresholds for limitations on lawsuits. N.J.S.A. 39:6A-8 (1988). The legislative sponsor of the bill expressed the hope that those limitations would "promote availability and affordability of automobile insurance." Sponsor's Statement to S. 2637 1 (L. 1988, c. 119). Similarly, at signing, Governor Kean characterized the amendment as "a first step toward implementing changes in a system which has penalized New Jersey drivers and driven insurance costs beyond the reach of many motorists." Governor's Signing Statement to S. 2637 (L. 1988, c. 119).
Two years later, the Legislature enacted further cost-containment measures via the "Fair Automobile Insurance Reform Act of 1990." L. 1990, c. 8. In that act, the Legislature stated that the past reform of the No-Fault Law had aspired to "provide to the motorists of the State a comprehensive [insurance scheme] that is equitable, efficient and economical." N.J.S.A. 17:33B-2(b) (1990).
**287 However, the findings acknowledged that it had "become increasingly obvious to the Legislature and the public that ... one of the principal goals [of reform] ha[d] not been attained: economy." N.J.S.A. 17:33B-2(d) (1990). As part of the 1990 round of reforms, the Legislature moved from limitless required PIP coverage to $ 250,000 in PIP coverage, N.J.S.A. 39:6A-4(a) (1990), demonstrating the Legislature's willingness to create some gaps in coverage in an attempt to reap the benefits of widespread decreased premiums.
C.
1.
Against that backdrop came the most recent amendments to the insurance law provisions that are at the heart of the instant case. Those alterations were part of a comprehensive set of legislative amendments accomplished through the Automobile Insurance Cost Reduction Act (AICRA). L. 1998, c. 21.
*273 The Legislature declared in AICRA's opening section that its goals were "to preserve the no-fault system, while at the same time reducing unnecessary costs which drive premiums higher." N.J.S.A. 39:6A-1.1(b) (1998). It attributed those "unnecessary costs" to medical benefits, which were "overutilized for the purpose of gaining standing to sue for pain and suffering." Ibid. As a result of those unnecessary costs and the resulting increase in insurance premiums, the Legislature determined that "many lower-income residents ... ha[d] been forced to drop or lapse their coverage." Ibid.
The Legislature set out to maintain the system while cutting costs through AICRA's multi-pronged plan, which adhered to the recognized "philosophical basis of the no-fault system ... a trade-off of ... providing medical benefits in return for a limitation on the right to sue for non-serious injuries." Ibid. AICRA changed the arbitration process used for benefit disputes, N.J.S.A. 39:6A-5.1 (1998), established bases for determining whether treatments **288 and diagnostic tests are medically necessary, N.J.S.A. 39:6A-4.7 (1998), revised the threshold for suits for noneconomic loss, N.J.S.A. 39:6A-8(b) (1998), and created insurance options with decreased coverage in exchange for lower premiums, N.J.S.A. 39:6A-3.1 (1998).
2.
With respect to the availability of decreased PIP coverage, provisions within AICRA take care to ensure that the decision to carry less-than-full PIP coverage is an informed and conscious one. The statute requires that the "coverage election form" used to select an insurance plan contain "in 12-point bold type ... that ... election of a basic automobile insurance policy will result in less coverage than the $ 250,000 medical expense benefits coverage mandated" prior to AICRA. N.J.S.A. 39:6A-3.2(a) (1998) ; N.J.S.A. 39:6A-4.3(e) (1998). The same provision contains no requirement about discussion of private causes of action for that gap in coverage. The "Buyer's Guide" -- required to be given to all insurance consumers -- also contains no such information regarding private causes of action. The absence of that information, in a provision and a document whose purposes are to help drivers make a fully informed decision about their insurance options, most logically fits within a scheme that did not intend for private causes of action to exist.
That reasoning formed part of the basis for this Court's decision in Roig, where a plaintiff sought to collect reimbursement for his out-of-pocket deductible and co-insurance costs from an allegedly negligent driver. 135 N.J. at 501, 505, 641 A.2d 248. The Court noted that insurance companies were required to tell "policyholders that they should consider a high deductible if they '[were] already covered by a health insurance policy or a health maintenance organization' because '[i]n most cases, those plans [would] pay part of the medical bills which auto insurance [would] not pay.' " Id. at 505, 641 A.2d 248 (alterations in original) (quoting N.J.A.C. 11:3-15.6 ). However, insurers were not required to inform **289 drivers that "they could recover their below-deductible expenses from a third party." Ibid. That choice, among other evidence of legislative intent, led this Court to conclude that the policies and purpose of the no-fault insurance scheme would be undermined if parties were allowed to sue in tort for deductibles and co-payments. Id. at 516, 641 A.2d 248.
The protections surrounding the use of lower PIP coverage options are not limited to notice prior to selection. AICRA provided that full PIP coverage will be assumed for a driver, unless a lower option is "affirmatively *274 chosen in writing." N.J.S.A. 39:6A-4.3(e) (1998). Further, once selected, the lower coverage option applies only to the named insured and household members who are not named insureds under another policy -- not to "any other person eligible for personal injury protection benefits required to be provided." N.J.S.A. 39:6A-4.3(f) (1998). Those provisions indicate that the Legislature was concerned that people might be subject to the lower PIP coverage limits without making the conscious decision to do so -- a concern that would seem overblown if a private cause of action remained to recover any medical costs above the selected PIP ceiling.
3.
AICRA's Sponsor's Statement noted that "the overutilization of medical benefits under automobile insurance policies" was "the principal cause of the escalation in premiums in recent years." Senate Sponsor's Statement to S. 3 1 (L. 1998, c. 21). To help control those costs, the Legislature determined to task the Division of Consumer Affairs' professional licensing boards with promulgating "a list of valid diagnostic tests to be used in conjunction with the appropriate health care protocols in the treatment of persons sustaining bodily injury." N.J.S.A. 39:6A-4.7 (1998) ; see also N.J. Coal. of Health Care Prof'ls, Inc. v. DOBI, 323 N.J. Super. 207, 223-24, 269-70, 732 A.2d 1063 (App. Div. 1999) (upholding N.J.A.C. 11:3-4, which implemented N.J.S.A. 39:6A-4.7 and created "care paths" to "maintain quality of care while ... discouraging **290 medically unnecessary treatments and diagnostic tests" from being claimed under PIP policies).
Additionally, disputes about the payment of benefits under an insured's PIP policy were kept out of the courts, and were instead required to proceed through a dispute resolution process established by the Commissioner of Banking and Insurance. N.J.S.A. 39:6A-5.1 (1998). The entire regulatory scheme ensured that benefits were paid according to their medical necessity, keeping premiums at a manageable level, while preventing such claims from inundating the court system.
Consistent with that effort to preserve the courts from inundation with numerous litigated matters concerning medical overutilization, medical necessity, and the like, AICRA also established new procedures and assigned considerable resources to combat fraud in the delivery of medical benefits. N.J.S.A. 17:33A-16 to -30 (1998). In exchange, AICRA provided a 3% premium reduction in auto insurance to account for "the effect of the enhanced insurance fraud provisions" of AICRA. N.J.S.A. 17:29A-51(a)(4) (1998). The anti-fraud provisions reinforced a legislatively anticipated shift away from litigation -- where the adversarial process previously was required to act as its own fraud filter.
4.
Although the enacted changes in AICRA provide best evidence of likely legislative intent, we note that the extrinsic aid of legislative history adds a bit more information on the subject of this appeal.
AICRA's legislative history demonstrates that there was a legislative awareness of the possibility of creating a gap in medical coverage should PIP coverage be lowered. At a meeting of the Joint Committee on Automobile Insurance Reform, the committee heard from a representative of the Association of Trial Lawyers of America-New Jersey. Testimony Regarding Personal Injury Protection (PIP) Reforms and Related Issues before the Joint Comm. on Auto. Ins. Reform, 36-64 (Jan. 22, 1998). The representative **291 advocated for a repeal of the no-fault system or, in *275 the alternative, for a $ 10,000 "med pay provision." Id. at 43. The representative acknowledged that the proposal would leave a gap of coverage between the proposed $ 10,000 med pay provision and the $ 75,000 threshold for coverage under the UCJF, but explained that costs in that gap could "simply shift to the private health carriers and to Medicare." Ibid.
In response to that proposal, a Joint Committee assemblyman voiced concerns about injured drivers "in the gap." Id. at 76. He urged that the committee should have more information about the number of drivers who would fall in this gap and should investigate the financial feasibility of lowering UCJF coverage to begin at $ 10,000 to close the gap. Ibid. However, even though that concern was raised at the hearing, there was no discussion of creating a part no-fault, part-fault system by allowing for private rights of action for injuries over the $ 10,000 med pay. While in no way dispositive, the excerpted discussion demonstrated an awareness by the joint legislative committee that lowering permissible medical coverage could create a "gap" for some drivers -- which presumes the absence of other forms of reimbursement, such as suits in tort, to fill that gap.[4]
**292 IV.
Because we do not find that the plain language of Section 12 is unambiguous and leads to only one interpretation, we approach the question at hand after careful consideration of the overall goals of the no-fault statutory scheme, its evolution, and the legislative history. As in Roig, our interpretative task here must be guided by the principle that legislative intent controls and we must read statutes sensibly with "the controlling legislative intent ... to be presumed as consonant to reason and good discretion." 135 N.J. at 515, 641 A.2d 248 (internal quotations omitted). And, "[i]n addition to the provision in question, we also consider the overall legislative scheme." SASCO 1997 NI, LLC v. Zudkewich, 166 N.J. 579, 586, 767 A.2d 469 (2001) (citing Fiore v. Consol. Freightways, 140 N.J. 452, 466, 659 A.2d 436 (1995) ).
Here, interpreting Section 12 to allow the admission of evidence of medical expenses falling between the insured's PIP policy limit and the $ 250,000 PIP statutory ceiling transgresses the overall legislative design of the No-Fault Law to "reduc[e] court congestion[,] ... lower[ ] the cost of automobile insurance[,]" and most importantly, avoid fault-based suits in a no-fault system, as we previously acknowledged in Roig. 135 N.J. at 516, 641 A.2d 248.
Based on the strong evidence of a legislative effort to avoid fault-based suits in *276 the realm of medical expenses in the No-Fault Law, we cannot conclude that the Legislature clearly intended Section 12 to allow fault-based suits consisting solely of economic damages claims for medical expenses in excess of an elected lesser amount of available PIP coverage. As this Court concluded in Roig, to do so would be to "lose sight of the overwhelming goals of reducing court congestion and lowering the cost of automobile insurance."[5] Ibid. Nor are we convinced that the third paragraph **293 was intended to suddenly authorize suits for economic damages for unpaid medical expenses merely because the definition of economic loss was amended. The thrust of that amendment does not support the full effect urged by plaintiffs -- namely, a right to bring a new cause of action where before one could not.
The extensive efforts to subject medical utilization and associated costs to careful review and control through AICRA's extensive regulatory programs and, to a lesser degree, its fraud prevention methods, would be undercut by the ability of a third party to sue for medical expenses above their PIP policy coverage limit but below the presumptive amount of $ 250,000. Those suits would commandeer the judicial resources that the arbitration system was enacted to preserve. And, as the NJDA highlights, trial courts would have no discernible basis to determine whether unpaid medical expenses are minor or how fee schedule adjustments or adjustments made pursuant to Medicare or Medicaid "would reduce the amounts actually recoverable to 'minor' amounts." Additionally, once in court, the plaintiff's suit could expand well beyond the administratively deemed medically-necessary treatments and diagnostic tests, fostering cottage industries of expensive litigation that are nowhere hinted at throughout the legislative development of AICRA.
In fact, the result of plaintiffs' reading of AICRA could allow the unintended -- and, one could assert, absurd -- consequence whereby someone who chooses a lower PIP coverage option could receive a higher overall reimbursement. For example, if a driver has $ 40,000 in treatment costs, but only $ 20,000 of those expenses are deemed medically necessary under AICRA, the driver would receive $ 20,000 in reimbursements and be considered fully reimbursed by the AICRA guidelines if he or she maintained the $ 250,000 "full coverage" policy. If, however, the driver had only $ 15,000 of PIP coverage, he or she would have a cause of action **294 under plaintiff's interpretation of the statute for the remaining $ 5000 of medically necessary expenses and, with that, could bring suit against the other driver for the remaining costs that would not otherwise be reimbursable -- allowing the driver with less PIP coverage to, theoretically, receive a higher overall reimbursement. We cannot envision that the Legislature countenanced such results.
We acknowledge the importance of the common law right to sue, but we reiterate that the Legislature's intent to abrogate the right of an injured party to have a day in court has underpinned the no-fault system since its inception. See Section III, supra. Under the No-Fault Law, the ability to sue is the exception, not the rule. Despite the fact that other aspects of our automobile insurance law are fault-based (e.g., property damage and pain and suffering caused by bodily injury), the Legislature *277 has consistently determined that medical costs are of a special breed. The Legislature has determined that the benefits of creating limited but automatic medical reimbursement for injured motor-vehicle-accident victims outweigh the ability of a minority of injured parties to recover larger amounts in tort.
Accordingly, we conclude that the Appellate Division judgment must be reversed. The interpretation given to Section 12 by the panel must, in our view, abide a time when the Legislature has more clearly indicated its intention.
In closing, we recognize that there are plausible readings of AICRA -- such as those adopted by the Appellate Division and plaintiffs and their supportive amici -- that result in a different outcome than we come to today.[6] Should the Legislature disagree **295 with our restrained interpretation of its statutory scheme, we invite the Legislature to make its intention to introduce fault-based suits into the no-fault medical reimbursement scheme more explicit. Without greater clarity of statutory language, we find any other reading of AICRA results in too large of a shift from the historical priorities and purposes of the statute.[7]
V.
The judgment of the Appellate Division is reversed and the matters are remanded to the trial courts for entry of their respective judgments of dismissal of the actions.
CHIEF JUSTICE RABNER and JUSTICE SOLOMON join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a dissenting opinion, in which JUDGE FUENTES (temporarily assigned) joins. JUSTICES PATTERSON, FERNANDEZ-VINA, and TIMPONE did not participate.

Bonnie L. Taft, Jacob's wife, is also a defendant in this matter because she was the vehicle's owner at the time of the accident.

N.J.S.A. 39:6A-8(a) limits an injured-insured party from recovering for noneconomic loss "unless that person has sustained a bodily injury which results in death; dismemberment; significant disfigurement or significant scarring; displaced fractures ; loss of a fetus; or a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement."

In 1998, the Legislature amended the definition of "economic loss" in N.J.S.A. 39:6A-2(k) to include uncompensated medical expenses. L. 1998, c. 21, § 2.

The same Joint Committee meeting also sheds some light on the scope of the gap in coverage, as the Legislature understood it to be. Senate President DiFrancesco, when referring to a statistic put forward that eighty-five percent of medical claims under PIP were for less than $ 10,000, stated that this figure was "basically in line with the information provided to us." Id. at 52.
That statistic can support two inferences. One is that most medical claims would be captured even if the minimum PIP amount was reduced to $ 15,000, as it was. We acknowledge that inference also could suggest that, by allowing fault based claims for economic losses above the $ 15,000, such suits would not be so numerous. Thus, they would have less of an impact on judicial resources if the Legislature intended to allow for the introduction of fault-based, stand-alone claims for medical expenses over the more minimal PIP thresholds. However, the small percentage of claims affected also could be interpreted to demonstrate that the Legislature found the number of such claims that likely would fall on private health insurers to be a fair trade-off for the savings in premiums.

Even under the potential carve-out contemplated in Roig, deductibles and copayments would have necessarily been based on charges already determined to be within the fee schedule and utilization framework of the cost-containment mechanisms of the PIP program.

We further recognize that, in at least one instance, a trial court adopted that interpretation as well. See Wise v. Marienski, 425 N.J. Super. 110, 124-25, 39 A.3d 947 (Law Div. 2011). To the extent that the parties argue that the Wise ruling, if incorrect, would have instigated action from the Legislature, we find that argument unconvincing. It would not be reasonable to import to the Legislature knowledge of every trial court decision. Moreover, the persuasive weight to be derived, if at all, from legislative inaction is undercut when other trial court decisions, such as those in the instant cases, reached an opposite conclusion. For similar reasons, it is inappropriate to speculate about the effect that a non-binding decision may or may not have had on the practice within a vicinage. Infra at 305-06, 204 A.3d at 283 (Albin, J., dissenting).

The dissent glosses over the legislative history to the no-fault system. That history reflects a decades-long attempt by the Legislature to balance a number of factors regarding its medical reimbursement scheme, including maintenance of prompt PIP payment without regard to fault, reduced premiums, and cost containment. In addition, the dissent never acknowledges the extensive legislative efforts under AICRA to contain medical utilization and control costs and to keep disputes related to utilization and cost containment out of the courts and in arbitration instead. Although the dissent makes a passionate case for what it believes New Jersey's policy in this highly legislated area should be, infra at 306, 204 A.3d at 283-84 (Albin, J., dissenting), that is for the Legislature, not the court system, to decide.